# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

|  |  |
|---|---|
| AAR MANUFACTURING, INC. D/B/A AAR MOBILITY SYSTEMS | ) ) ) |
|  | ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) |
| TABER EXTRUSIONS, LLC | ) ) |
| Intervenor. | ) ) ) |

**Redacted Version**

Civil Action No. 1:20-cv-00459-RAH
Judge Richard A. Hertling

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND A PERMANENT INJUNCTION AND DECLARATORY RELIEF

Dated: May 18, 2020

Respectfully submitted,

Paul R. Hurst
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
Telephone: (202) 429-8089
Facsimile: (202) 429-3902
E-mail: phurst@steptoe.com

**Attorney of Record for AAR Mobility Systems**

*Of Counsel:*

Fred W. Geldon
Caitlin T. Conroy
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
Telephone: (202) 429-3000
Facsimile: (202) 429-3902
E-mail: fgeldon@steptoe.com
E-mail: cconroy@steptoe.com

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     QUESTION PRESENTED ................................................................................... 4

III.    STATEMENT OF THE CASE ............................................................................ 5

IV.     STATEMENT OF THE FACTS ......................................................................... 6

        A.      The Air Force's RFP to Award the Next-Gen Pallet Production Contract ............. 6

        B.      UDRI's and Taber's Roles in Developing and Materially Contributing to the Requirements and Specifications for this RFP, Including the TDP................. 7

                1.      Taber's Performance Under the 2014 Contract ............................. 7

                2.      Taber's Performance Under Task Order 13 ................................. 12

        C.      Questions About Taber's Role During this Procurement ....................................... 13

        D.      AAR's GAO Protest and the Air Force's Flawed OCI Investigation ................... 14

        E.      GAO's Decision ..................................................................................................... 15

V.      ARGUMENT ..................................................................................................... 16

        A.      Jurisdiction and Standards of Review .................................................................... 16

        B.      AAR Has Succeeded on the Merits in Demonstrating that the Air Force's OCI Review Was Arbitrary and Capricious and Contrary to Law ....................... 17

                1.      The Air Force Admitted that Taber Has a Biased Ground Rules OCI Based on Taber's Material Contributions to the RFP's Specifications .............................................................................. 19

                        a.      The Air Force Erroneously Concluded that Taber Qualified as a "Development and Design" Contractor. ................................. 23

                        b.      GAO Also Misapplied the Development and Design Exception ................................................................. 27

                        c.      The Multiple Contractor Exception is Inapplicable ...................... 32

                2.      Despite Recognizing the Significant Potential Impaired Objectivity OCI, the Air Force Failed to Avoid, Neutralize, or Mitigate the OCI .................................................................................................. 38

                3.      The Air Force's Review of the Unequal Access to Information OCI Was Inadequate and Revealed Taber's Access to Non-Public Program Information Resulting in an Unfair Competitive Advantage .................................................................................... 42

                4.      AAR Has Suffered Prejudice ...................................................... 48

        C.      AAR Meets the Permanent Injunctive Relief Requirements ................................ 49

                1.      AAR Will Suffer Irreparable Harm If Relief Is Not Granted ................ 49

Case 1:20-cv-00459-RAH   Document 24   Filed 05/18/20   Page 3 of 57

|   | 2. | The Balance of Hardships Decidedly Favors AAR | 50 |
|   | 3. | Injunctive Relief Will Serve the Public Interest | 50 |
| **VI.** | **CONCLUSION** | | 50 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Relocation Connections L.L.C. v. United States,*
   789 Fed. Appx. 221 (Fed. Cir. 2019) ...................................................................48

*ARINC Eng'g Servs., LLC v. United States,*
   77 Fed. Cl. 196 (2007) ........................................................................................17

*Bannum, Inc. v. United States,*
   404 F.3d 1346 (Fed. Cir. 2005) ...........................................................................16

*Centech Grp., Inc. v. United States,*
   554 F.3d 1029 (Fed. Cir. 2009) ...........................................................................17

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971) ............................................................................................44

*CliniComp Int'l, Inc. v. United States,*
   134 Fed. Cl. 736 (2017), *aff'd,* 904 F.3d 1353 (Fed. Cir. 2018) ...........................12

*CW Gov't Travel, Inc. v. United States,*
   61 Fed. Cl. 559 (2004) ...................................................................................49, 50

*Data Mgmt. Servs. Jt. Venture v. United States,*
   78 Fed. Cl. 366 (2007) ........................................................................................27

*Ernst & Young, LLP v. United States,*
   136 Fed. Cl. 475 (2018) .................................................................................28, 47

*Filtration Dev. Co., LLC v. United States,*
   60 Fed. Cl. 371 (2004), *petition for enforcement denied,* 63 Fed. Cl. 418
   (2005) ..................................................................................................................25

*FMC Corp. v. United States,*
   3 F.3d 424 (Fed. Cir. 1993) .................................................................................49

*Green Tech. Grp., LLC v. United States,*
   147 Fed. Cl. 231 (2020) ......................................................................................50

*HP Enter. Servs., LLC v. United States,*
   104 Fed. Cl. 230 (2012) ......................................................................................49

*Jacobs Tech. v. United States,*
   100 Fed. Cl. 198 (2011) ......................................................................................17

*L-3 Commcn's EOTech, Inc. v. United States*,
    87 Fed. Cl. 656 (2009) .................................................................................16, 17

*NetStar-1 Gov't Consulting, Inc. v. United States*,
    101 Fed. Cl. 511 (2011), *aff'd*, 473 F. App'x 902 (Fed. Cir. 2012) .....................17, 20, 42, 48

*Turner Constr. Co. v. United States*,
    94 Fed. Cl. 561 (2010), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).........................................38, 40

*Turner Constr. Co. v. United States*,
    645 F.3d 1377 (Fed. Cir. 2011)...........................................................42, 43, 44

*Vantage Assocs. Inc. v. United States*,
    59 Fed. Cl. 1 (2003) ...........................................................................20, 26

*Weeks Marine, Inc. v. United States*,
    575 F.3d 1352 (Fed. Cir. 2009).................................................................16

**GAO Decisions**

*AAR Mobility Sys.*,
    B-418339, Mar. 17, 2020, 2020 CPD ¶ 106 .................................................. *passim*

*Alion Sci. & Tech. Corp.*,
    B-297022.3, Jan. 9, 2006, 2006 CPD ¶ 2.................................................................41

*Am. Artisan Prods, Inc.*,
    B-292559, B-292559.2, Oct. 7, 2003, 2003 CPD ¶ 176 ...............................................34

*ASM Research*,
    B-412187, Jan. 7, 2016, 2016 CPD ¶ 38....................................................................39

*C2C Innovative Sols., Inc.*,
    B-416289, July 30, 2018, 2018 CPD ¶ 269 ..............................................................43

*DRS Tech. Servs., Inc.*,
    B-411573.2, B-411573.3, Nov. 9, 2015, 2015 CPD ¶ 363 ....................................41

*Humanetics Innovation Sols.*,
    B-416979.3, May 15, 2019, 2019 CPD ¶ 183...........................................................6

*J&E Assocs., Inc.*,
    B-278771, Mar. 12, 1998, 98-1 CPD ¶ 77 ............................................................40, 41, 42

*Johnson Controls World Servs.*,
    B-286714.2, Feb. 13, 2001, 2001 CPD ¶ 20 ..........................................................41

*Lucent Techs. World Servs., Inc.*,
    B- 295462, Mar. 2, 2005, 2005 CPD ¶ 55 ...............................................................28

*NCI Info. Sys., Inc.*,
    B-412870.2, Oct. 14, 2016, 2016 CPD ¶ 310 ........................................................41

*Nortel Gov't Sols.*,
    B-299522.5, B.299522.6, Dec. 30, 2008, 2009 CPD ¶ 10 ...............................41, 42

*Ressler Assocs., Inc.*,
    B-244110, Sept. 9, 1991, 91-2 CPD ¶ 230 ..........................................................28

*Sys. Made Simple, Inc.*,
    B-412948.2, July 20, 2016, 2016 CPD ¶ 207 ......................................................34

**Statutes**

5 U.S.C. § 706...........................................................................................................16

28 U.S.C. § 1491..................................................................................................16, 50

**Rules and Regulations**

DoD Directive 5500.10 (June 1, 1963).....................................................................20

FAR 3.101-1 ...............................................................................................................4

FAR 9.502....................................................................................................................2

FAR 9.504.............................................................................................................*passim*

FAR 9.505.............................................................................................................*passim*

FAR 9.508.............................................................................................................*passim*

**Other Authorities**

James W. Taylor, *Organizational Conflicts of Interest in Department of Defense
    Contracting*,
    14 Pub. Cont. L.J. 158 (1983).........................................................................19, 20

Robert S. Pasley, *Organizational Conflicts of Interest in Government Contracts*,
    1967:1 Wis. L. Rev. 5 (1967) ...............................................................................19

## I.  INTRODUCTION

Plaintiff AAR Manufacturing, Inc. d/b/a AAR Mobility Systems ("AAR") submits this memorandum in support of its Motion for Judgment on the Administrative Record and Permanent Injunction requesting that this Court enjoin the U.S. Department of the Air Force ("Air Force") from permitting Taber Extrusions LLC ("Taber") to compete for award under Request for Proposals No. FA8534-R-19-0001 due to Taber's immitigable organizational conflicts of interest ("OCI").

This protest asks the Court to preserve the public trust in the award of a ten-year production contract, with a dollar value estimated by the Air Force in excess of $_____ to manufacture air cargo pallets, in accordance with the RFP's technical specifications, for use in the military's standardized "463L" cargo and materials handling support system.  Taber performed work as an acquisition support subcontractor on two related contracts that the Air Force awarded specifically for the purpose of generating the technical specifications and the "Technical Data Package" for this procurement.  Taber's role providing systems engineering and technical direction services under these contracts gives rise to all three types of recognized OCIs: biased ground rules, unequal access to information, and impaired objectivity, giving Taber an unfair advantage in this competition and exposing the government to serious performance risks.

The Federal Acquisition Regulation ("FAR") requires contracting officers to identify and evaluate potential OCIs and then avoid, neutralize, or mitigate significant OCIs.  This is a key tenet to preserving the integrity of the Federal procurement system.  Here, however, the Air Force failed to conduct a legally sufficient OCI investigation and arbitrarily concluded that, despite the existence of certain OCIs, Taber should be permitted to freely compete for award of this contract.  By ignoring the OCIs presented by Taber's subcontractor role, the Air Force abandoned its regulatory obligation to avoid, neutralize, or mitigate OCIs.

The Administrative Record ("AR") leaves no question that Taber's role in "materially contributing" to the specifications and Technical Data Package for this RFP created a biased ground rules OCI. The Air Force agrees with AAR on this fundamental point. It conducted an OCI investigation and concluded that "Taber materially contributed to the technical data package" that became part of this RFP and "in some sense set[] the ground rules" for this production contract. The Air Force, however, is attempting to sweep Taber's conceded biased ground rules OCI under the rug by wrongly asserting that two OCI exceptions identified in FAR 9.505-2 apply – the "development and design contractor" and the "multiple contractor" exceptions.

In each case, the Air Force is misapplying these exceptions by ignoring the express terms of the FAR's OCI rules and the policy behind them. The FAR provides that the "development and design contractor" exception is reserved for those contractors who have done "the most advanced work in the field," with "prior knowledge," and with "overall contractual responsibility for development or production." FAR 9.502(b)(4), 9.505-1(a), 9.505-2. The Air Force, however, is seeking an untenable expansion of this exception to apply it where the so-called "development and design" work involves nothing more than preparing or materially contributing to a solicitation to competitively procure non-development items. This type of work presents the "classic" biased ground rules OCI where a contractor provides either (a) "systems engineering and technical direction" to assist an agency in defining requirements, developing a work statement or supervising design (FAR 9.505-1) or (b) assists in preparing or "materially contributes" to a work statement (FAR 9.505-2). Although those contractors might be performing certain design and development work (i.e., design and system engineering tasks), the exception does not apply to them because they have not previously developed the system

2

identified in the procurement, they lack overall responsibility for the 463L air cargo pallet program, and because they are specifically tasked with preparing the ground rules – the technical specifications to be incorporated into the RFP.  The Air Force thus fails to distinguish between true product design and development, which is excepted from OCI prohibitions, and procurement specification development and systems engineering/technical assistance work, which is not.

Similarly, the Air Force ignores the purpose of the multiple contractor exception, which recognizes that the possibilities of bias and unfair advantage are mitigated when multiple contractors have input into the **same** work statement or portion of the system specifications.  The Air Force, however, improperly seeks to apply this exception where the record clearly establishes that Taber was the only subcontractor with the ability to skew the grounds rules to favor its own aluminum extrusion capabilities and that, in fact, it did exactly that.  This is precisely the situation that the biased ground rules OCI is intended to prevent.

The Air Force also failed to address the impaired objectivity OCI that would be created if Taber is awarded this production contract.  If it receives award under this RFP, Taber would be placed in the dual and conflicting roles of (a) "contribut[ing] materially" to the RFP's technical specifications as the acquisition support subcontractor and (b) fulfilling its contractual obligations under the production contract to identify system safety issues, propose design changes, and monitor production quality.  Its ability to render impartial advice to the Air Force under the production contract would be undermined given the risk that Taber might be reluctant to question the merit or quality of the technical specifications to which it had materially contributed.  The Air Force's OCI mitigation, however, consists of nothing more than an unsupported hunch that Taber would not act in its own interest (and potentially against the Air Force's interests) in performing this contract.  This position is inconsistent with the OCI

3

regulations – directing agencies to presume that contractors would act in their own interests and to take steps to avoid, neutralize, or mitigate actual and potential OCIs.

Finally, the Air Force failed to take reasonable steps to neutralize or mitigate the unequal access to information OCI presented by Taber's role as an acquisition support subcontractor.  In violation of its regulatory obligation to identify and evaluate the content of information shared with Taber, the Air Force instead chose to rely on conclusory, boilerplate assurances from Taber and Air Force personnel that no one remembers any source selection information being shared. These *post-hoc* assurances, however, are contradicted by the record demonstrating that Taber has unique access to the government's competitively useful  information.

For these reasons, the Air Force's OCI review violates a fundamental principle of Federal procurement that "[t]ransactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct" and, accordingly, agencies must "avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."  FAR 3.101-1.  The Air Force fell well short of this principle here.  To preserve the public trust in the award of this 10-year manufacturing contract and to strictly avoid any actual or apparent significant OCIs, the Court should grant AAR's motion for judgment on the administrative record and permanently enjoin the Air Force from permitting Taber to participate in this procurement as either a prime contractor or subcontractor.

## II.     QUESTION PRESENTED

Whether this Court should enjoin the Air Force from permitting Taber to participate in this procurement where (1) AAR has demonstrated success on the merits because the Air Force arbitrarily failed to exclude Taber from this procurement on the basis of an inadequate OCI investigation that misapplied applicable law; (2) AAR will suffer immediate and irreparable injury if Taber is permitted to compete in this procurement; (3) the harm to AAR if the Air Force

permits Taber to compete outweighs any harm that the Air Force might suffer; and (4) enjoining the Air Force from permitting Taber to compete in this procurement award would serve the public interest in maintaining the fairness and integrity of government procurements.

## III.   STATEMENT OF THE CASE

This protest seeks the Court's review of the Air Force's arbitrary and irrational decision to permit Taber, an acquisition support subcontractor, to compete in this procurement despite (i) the unfair advantage it gained by materially contributing to the technical specifications in this procurement and by participating in providing systems engineering and technical assistance to the Air Force; (ii) the impaired objectivity OCI created by Taber's dual role as a systems engineering support contractor and a production contractor; and (iii)  the unequal access to information it gained by providing these services.  AAR files this pre-award bid protest action to challenge the Air Force's insufficient OCI investigation and its conclusion that Taber can participate in this procurement, despite these OCIs.

Although AAR initially filed this pre-award protest with the Government Accountability Office ("GAO"), which denied AAR's protest, this Court reviews each protest ground *de novo* and owes GAO's decision no deference.  In any event, GAO's decision is arbitrary and not supported by the record.  As explained below, among other deficiencies in its analysis, GAO adopted the erroneous conclusions of the Air Force's OCI review and applied an overly broad definition of a "development and design" contractor that would effectively repeal significant portions of the FAR's regulations governing OCIs.

For the reasons detailed below, the Court should grant AAR's motion for judgment on the administrative record, issue the injunctive relief requested by AAR, and enjoin the Air Force from permitting Taber to compete under this RFP as a prime contractor or subcontractor.

## IV.    STATEMENT OF THE FACTS

### A.    The Air Force's RFP to Award the Next-Gen Pallet Production Contract

On August 19, 2019, the Air Force issued this RFP for the manufacturing of 463L Air

Cargo pallets – the Next Generation All Aluminum Pallet ("Next-Gen Pallet").  Specifically, this

RFP calls for the award of a 10-year indefinite delivery requirements contract for the production

of an estimated 118,000 units of the 463L Air Cargo pallets for the US military.  AR Tab 65 at

1067-128.  The successful contractor will be required to manufacture the Next-Gen Pallet, using

an all-aluminum design in accordance with technical documents attached to the RFP, including

the military Detail Specification, MIL-DTL-27433G, and the Government's Technical Data

Package (TDP) (drawing 201993 426).  AR Tab 69 at 1579-80.  In the manufacturing industry,

this type of procurement is referred to as "Build to Print" whereby a manufacturer produces the

product, according to the customer's specifications.  *See Humanetics Innovative Sols.*, B-

416979.3, May 15, 2019, 2019 CPD ¶ 183 at *2 n.7 ("[T]he term 'build to print' "has been used

to mean that the solicitation contains a TDP that provides information sufficient for a competent

manufacturer to fabricate, assemble, and test an item.").

The 463L Air Cargo Pallet is part of the Air Force's universal 463L cargo and materials

handling system, so the pallets must be compatible with the 463L system, such as

loading/unloading equipment, and the 463L cargo rail system, and must meet other existing

military and commercial air transport requirements.  *See* AR Tab 65 at 1175.  The Air Force has

about 100,000 to 150,000 pallets of the current design, the HCU-6/E, in use at any given time.

AR Tab 39 at 575.  The current pallet design is more than 50-years old and is not fully reusable

because it combines less robust materials – a balsa wood core and aluminum exoskeleton.  AR

Tab 39 at 589, Tab 40 at 670, Tab 43 at 720.

This ten-year production contract provides for an 18-month base period for first article production, testing, and related activities, and eight 12-month and one six-month option periods for low rate and full rate production (with options for surge quantities starting in Option II).  AR Tab 65 at 1067-68.  The contractor will be required to deliver to the Air Force six articles for first article testing within 12 months of award in accordance with MIL-DTL-27443.  *Id.*

**B.     UDRI's and Taber's Roles in Developing and Materially Contributing to the Requirements and Specifications for this RFP, Including the TDP.**

Between 2014 and 2017, the Air Force entered into at least two systems engineering contracts with the University of Dayton Research Institute ("UDRI") to prepare – for this RFP – the government-owned TDP and specifications for an enhanced 463L pallet design that would include an all-aluminum pallet (exoskeleton and core), the so-called the Next-Gen Pallet.  For each of these contracts, Taber, an aluminum extrusion company, served as a systems engineering support subcontractor to UDRI, working closely with UDRI and the Air Force to define the requirements for this RFP.

Under the 2014 Contract, UDRI prepared, tested, and evaluated a technical data package with significant input from Taber as its aluminum extrusion subcontractor.  The two companies worked through alternative extrusion process plans to prepare a TDP that would be used in the Air Force's competitive procurement of a production contract.  In 2017, UDRI, again with Taber's assistance, continued this effort to further refine the production contract TDP, focusing on manufacturing and implementation issues for this procurement.

**1.     Taber's Performance Under the 2014 Contract**

In January 2014, UDRI submitted a proposal in response to the Air Force's FY 2013 Rapid Innovation ("RIF") Broad Agency Announcement ("BAA") for the improvement of manufacturing technologies and capabilities.  AR Tab 109 at 2876, 2879, 2881.  UDRI's

proposal asserted that a "*relatively* new manufacturing process utilizing large unitized extrusions that are friction stir welded together can be used to manufacture a form, fit, and function replacement" of the current 463L pallet with an all-aluminum pallet. *Id.*, 2881. According to UDRI, the Next-Gen Pallet design is "compatible with the current cargo pallet" and the military's 463L cargo system – a critical requirement for the pallet to be usable. Because the Next-Gen Pallet is a "form, fit, function" replacement of the currently used pallet, "[t]o the user, the Next-Gen pallet will appear identical to the current pallet, except it will be [12] pounds lighter." *Id.*, 2891-92. In other words, this would not be a new product – it would be a revision of the existing pallet design.

For this effort, UDRI proposed a "System Engineering Process" to fabricate, test and evaluate its Next-Gen Pallet design for the purpose of developing a government-owned reprocurement engineering data package and new specifications to support the Air Force's competitive procurement of a production contract. *See id.*, 2886. UDRI proposed leveraging the experience of two subcontractors in two separate areas – Taber and Manufacturing Technology Inc. ("MTI"). *Id.*, 2882. Specifically, UDRI proposed to "███████████████████████████ ████████████████████" and rely on Taber to "███████████████████████████████ ████████████" for manufacturing process trials and fabrication of six full size Next-Gen Pallets. *Id.*, 2886, 2896. MTI, on the other hand, would be responsible for a different area – friction stir welding ("FSW") and pallet fabrication. *Id.*, 2887. In the event that issues arose in the testing of the design, UDRI proposed that the three team members would "████████ ███████████████████████████████." *Id.*, 2889. UDRI's proposal predicted that the developed corrective action plan would include design modification – "████████████████ ███████████████████████████." *Id.*, 2887.

In August 2014, based on UDRI's proposal, the Air Force awarded UDRI the first systems engineering contract to develop the TDP and specifications for this production contract. AR Tab 100 (referred to as the "RFP Development Contract" or "2014 Contract"). The scope of work for this contract reflected UDRI's proposal and included systems engineering support, specifically for the "development" of requirements, including (i) defining the requirements and the pallet's performance characteristics and (ii) preparing the TDP and other specifications.

As proposed, UDRI subcontracted with Taber in November 2014 to assist in the requirements definition for this procurement. Among other tasks, Taber's role included involvement in the "requirements definition process" for the current procurement, stating: "The Contractor shall select and subcontract with an aluminum extrusion company [Taber] to fabricate the extrusion dies and extrude the Next-Gen pallet subcomponents . . . . The Contractor shall work with these subcontractors to develop and ***define the requirements*** and shall produce a minimum of six Next-Gen cargo pallets for Test & Evaluation/Qualification efforts." *Id.*, 2499 (emphasis added). The AR also establishes that Taber would provide "technical input . . . for extrusion standards" to support the development of the TDP. AR 4098 ("Engineering Data Guidance Meeting Minutes"). Taber also was tasked with establishing an aluminum extrusion process that would "create middle and edge panel cross sections that fit within the contract requirements ***and*** were readily capable of being produced economically in high volumes." AR Tab 1 at 2 (citing AR Tab 106 at 2805) (emphasis added).

The AR demonstrates that Taber's role was not limited to simply manufacturing but instead included providing input into the definitional requirements for this RFP. The Air Force's OCI Review, for example, concluded that Taber had contributed materially to the TDP in the

area of the "stacked die design" (the incorporation of both middle and edge panel extrusions in one die) after UDRI had difficulties in the extrusion process.  AR Tab 75 at 2400.

There, after UDRI had approved Taber's final die drawing and after Taber had produced each of the extrusions (edge rail, edge panel, and middle panel), Taber encountered "███████ ███████████████████████."  AR 3396-97.  UDRI reported to the Air Force that ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████."  *Id.*  According to UDRI, it "had numerous telecons with Taber" to address these issues and develop a "series of alternative plans."  Essentially, due to these issues, Taber had to attempt several manufacturing techniques to establish an aluminum extrusion process that would allow for the economical production of quality extrusions.  The alternative plans are set forth below:

- █ ███████████████████████
- █ █████████████████████████████
- █ ██████████████████████████████████████████████ ███████████████████████████████████████████
- █ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████
- █ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████

*Id.*, 3396-97.  The UDRI team planned to proceed with the manufacturing trials and critical testing of the Plan A – Option 1 design, while evaluating the alternative designs.  *Id.*  In April 2015, during a visit to MTI's facility, UDRI and Taber further discussed with the Air Force these

production issues and how the team planned to address them. *Id.*, 3583. Specifically, Taber

███████████████████████████████████████████████████████████████

████████████████████████." *Id.* Unrelated to the significant extrusion issues, the

meeting minutes reflect that Taber also provided its assessment of a "██████████████████

████████████" sharing that it would be "███████████████████████████████████

████████████████████." *Id.*, 3584.

In September 2015, UDRI modified Taber's subcontract to fund the Plan C "stacked-die"

design trials. *Id.*, 3379. The following month, UDRI "████████████████████████████

███████████████████████████████████████████." *Id.*, 3444. These dies

ended up failing during die trials "for a variety of reasons" and the extrusions "were not useable"

and deemed "unrepairable." *Id.*, 3471. UDRI and Taber planned to investigate this failure at a

later time. *Id.* Pursuant to an additional modification of Taber's subcontract, in January 2015,

Taber also "████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████" –

a version of Plan B. *Id.*, 3471. By June 2016, the plan was to proceed with manufacturing trials

and critical testing of the Plan A – Option 1 design while pursuing Plan B." *Id.*, 3501.

The 2014 Contract effort concluded in August 2016 with UDRI's delivery of comments

on MIL-DTL-2433, the Final Technical Data Package, the Final Program Review Presentation,

and the Qualification Test Report. UDRI also delivered a Final Report reflecting its team's

conclusions and recommendations, providing the basis for the Final TDP, specifications and

Qualification Test Report. *Id.*, 3337. In its Final Report, UDRI reported that "█████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████." *Id.* UDRI also reported on the results of its manufacturing trials,

including Taber's assessment of the results. Specifically, UDRI explained that although the

stacked design approach (Plan C) failed, rendering the die unserviceable, it noted that "█████

██████████████████████████" and that Taber████████████

██████████████████████████████████████████████████

████████████████████████████." *Id.*

<h3>2.    Taber's Performance Under Task Order 13</h3>

Following, the conclusion of the 2014 Contract, the Air Force continued to engage UDRI

for systems engineering support services to refine the TDP for this production contract. In May

2017, the Air Force awarded UDRI a task order under an existing IDIQ contract for acquisition

advisory services – specifically "Support Equipment & Vehicles (SEV) Airborne Systems

Engineering Support." AR Tab 76 (referred to as "Task Order 13"). The Government's publicly

available data from usaspending.gov indicates that the Air Force used assisted acquisition

services funds for this award. *See* Exhibit. 1 at 2.[1] Under Task Order 13, UDRI was again

tasked to provide systems engineering support for this procurement, this time to broadly assist

the Air Force in "[a]ddressing challenges to the Next-Gen Pallet Manufacturing and

Implementation." AR Tab 77 at 2465. This includes work to "develop mitigation strategies to

address manufacturing challenges, conduct manufacturing process-improvement and maturation

activities, and prove those with trials resulting in components for ground, laboratory, and flight

testing as well as field trials." AR Tab 76 at 2457.

---

[1] In addition to the administrative record, the Court is permitted to consider materials that are
matters of public record and not subject to reasonable dispute. *See CliniComp Int'l, Inc. v.
United States*, 134 Fed. Cl. 736, 749 (2017), *aff'd*, 904 F.3d 1353 (Fed. Cir. 2018).

Taber is also a subcontractor to UDRI under Task Order 13. In this role, Taber supports UDRI in providing engineering support services by assisting with ███████████████



. AR Tab 75 at 2447. The record indicates that, under Task Order 13, UDRI has completed manufacturing and shipping of 500 test pallets for field testing. Taber, provided inspection reports including ██████████████ ████████ *See* AR Tab 77 at 2467. The record also demonstrates that Taber participated in at least seven meetings with the Air Force and UDRI to discuss the refinement of the manufacturing process for the TDP. *See* AR Tab 75 at 2447-48. The specific information shared in those meetings, however, is not reflected in the administrative record or in the Air Force's OCI review.

## C.    Questions About Taber's Role During this Procurement

While performance under Task Order 13 was underway, the Air Force issued a pre-solicitation notice for this production contract. During pre-solicitation Questions and Answers ("Q&A"), potential offerors repeatedly asked the Air Force about Taber's contributions to the RFP and potential role as an offeror in this procurement. In particular, offerors informed the Air Force that sections of the Next-Gen Pallet specified in the draft RFP were unnecessarily wide and that Taber was the only US extrusion company capable of producing them. AR Tab 53 at 1016-17. Each of the four sections of the original pallet design are friction-stir welded together to make a single pallet, but the width of each section is important because the equipment available for the aluminum manufacturing limits the width of the section that can be produced. *Id.* By requiring unnecessarily wide sections, the draft RFP would have turned the solicitation into a single-source procurement because only Taber had the equipment needed to make those unnecessarily-wide sections.

After the Pre-Solicitation Conference, the Air Force issued revised drawings maintaining the same design, but separating the pallet into six sections, effectively reducing the width of the sections that would be friction-stir welded together to make a single pallet.  *See* AR Tab 74 at 2375 *Compare* AR Tab 73 at 1931.  Because the friction stir-weld process maintains at least 95% of the original metal's strength, the change in the design from four panels to six did not affect the pallet's other performance characteristics.  When pressed in the fourth round of pre-solicitation Q&As, the Air Force admitted that the pallet design had been split into six sections to allow aluminum extrusion firms other than Taber to compete.  AR Tab 58 at 1024.

The Air Force's responses to these questions, however, failed to specifically address the concerns about Taber's involvement in the work to develop the specifications for this RFP and ignored the most troubling aspect of these exchanges – Taber had improperly influenced the TDP to favor itself in this regard and the Air Force's increase in the panel sections did nothing to protect against other ground rules improperly influenced by Taber.

## D.     AAR's GAO Protest and the Air Force's Flawed OCI Investigation

Because the Air Force failed to address the OCI issues presented by Taber's role on the 2014 Contract and Task Order 13, AAR filed a pre-award protest at GAO on December 11, 2019, challenging the Air Force's decision not to exclude Taber from the procurement despite its biased ground rules, impaired objectivity, and unequal access to information OCIs.[2]

In response to AAR's GAO protest, the Air Force Contracting Officer ("CO") conducted, for the first time, a belated and result-oriented review of AAR's OCI allegations to assess Taber's dual roles ("the Air Force OCI Review").  The Air Force's hasty review suffered from several fundamental flaws.  **First**, the CO determined that Taber had a biased ground rules OCI,

---

[2] On December 12, 2019, AAR timely submitted its proposal for this RFP.  AR Tab 72 at 1651.

finding that Taber "materially contributed to the [TDP]," that became part of the Next-Gen Cargo specification, and it was therefore "plausible that Taber could have unintentionally skewed the competition towards itself," but the CO then quickly dismissed Taber's OCI by misapplying the design and development contractor exception and the multiple contractor exception. AR Tab 75 at 2399. **Second**, the CO ignored Taber's impaired objectivity OCI by summarily concluding that, notwithstanding its possible interests to the contrary, Taber would do the right thing and report any flaws in its TDP to the Air Force. **Third**, the CO failed to review the information Taber actually received under its UDRI contracts and instead accepted, without further investigation, the conclusory boilerplate statements of Air Force, UDRI, and Taber declarants, stating that they did not recall Taber receiving competitively useful information.

### E.     GAO's Decision

GAO's decision denying AAR's protest suffers from factual and legal errors and cannot support the Air Force's flawed decision to permit Taber to compete in this procurement. GAO adopted the Air Force's mischaracterization of Taber's role supporting the 2014 Contract and Task Order 13 and the Air Force's erroneous legal conclusion that Taber was excepted from the prohibition against biased ground rules OCIs.  Moreover, GAO failed to recognize the multiple deficiencies in the Air Force's OCI Review – specifically the Air Force's failure to investigate Taber's unequal access to information OCI, and its failure to even attempt to mitigate Taber's impaired objectivity OCI.  *See AAR Mobility Sys.*, B-418339, Mar. 17, 2020, 2020 CPD ¶ 106.

As set forth below, the Air Force's decision to permit Taber to compete for this procurement is based on a legally deficient OCI Review, the reasonableness of which is contradicted by the AR.

Case 1:20-cv-00459-RAH   Document 24   Filed 05/18/20   Page 22 of 57

## V.     ARGUMENT

### A.     Jurisdiction and Standards of Review

The Court has jurisdiction over pre-award bid protest actions pursuant to 28 U.S.C.

§ 1491(b)(1).  This Court is authorized in such cases to award "any relief that the court considers

proper, including declaratory and injunctive relief." *Id.* § 1491(b)(2).  AAR is an interested party

to bring this action because (i) it is an actual offeror whose direct economic interest would be

affected by the Air Force's decision to allow Taber to compete for this procurement, (ii) AAR is

objecting to the Air Force's inadequate OCI investigation and its violation of statutes or

regulations in connection with this procurement, and (iii) AAR "has a definite economic stake in

the solicitation being carried out in accordance with applicable laws and regulations." *Weeks

Marine, Inc. v. United States*, 575 F.3d 1352, 1359-62 (Fed. Cir. 2009).

It is well established that the "proper standard to be applied in bid protest cases is

provided by 5 U.S.C. § 706(2)(A)." *L-3 Commcn's EOTech, Inc. v. United States*, 87 Fed. Cl.

656, 664 (2009).  As a result, the Court "shall set aside the agency action if it is 'arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004)).

Pursuant to RCFC 52.1, this Court reviews an agency's procurement decisions to determine

whether those decisions are supported by the administrative record.  In reviewing cross-motions

for judgment on the administrative record, the court examines whether, based on the evidence in

the record, given all the disputed and undisputed facts, the plaintiff has met its burden of proof –

that a significant error "marred the procurement."  *See Bannum, Inc. v. United States*, 404 F.3d

1346, 1355 (Fed. Cir. 2005); *L-3 Commcn's EOTech*, 87 Fed. Cl. at  664.

To obtain a permanent injunction, AAR must demonstrate that (1) it has achieved success

on the merits; (2) it will suffer irreparable harm if its request for injunctive relief is not granted;

(3) the harm AAR will suffer outweighs the harm to the government; and (4) the injunction serves the public interest. *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted). AAR respectfully submits that its request for injunctive relief satisfies all four elements of the test for injunctive relief, and it is therefore appropriate for this Court to enjoin the Air Force from permitting Taber to participate in this procurement.

**B.      AAR Has Succeeded on the Merits in Demonstrating that the Air Force's OCI Review Was Arbitrary and Capricious and Contrary to Law**

FAR 9.505's OCI provisions require contracting officers to identify and evaluate potential conflicts of interest as early in the acquisition process as possible, and to avoid, neutralize or mitigate potential significant OCIs so as to prevent an unfair competitive advantage or the existence of conflicting roles that might impair a contractor's objectivity. *NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 521 (2011), *aff'd*, 473 F. App'x 902 (Fed. Cir. 2012); *Jacobs Tech. v. United States*, 100 Fed. Cl. 198, 210-11 (2011). A contracting officer may not "ignore and not evaluate known potential OCIs prior to award." *NetStar-1*, 101 Fed. Cl. at 521 (citations and quotations omitted)). In evaluating an OCI protest, the Court reviews an agency's OCI investigation for reasonableness, and will overturn the contracting officer's determinations where they are arbitrary, capricious, or otherwise contrary to law. *Id.* An agency's OCI investigation conclusions must be reasonable and consistent with procurement regulations. *See id.* at 522.

This Court has recognized three categories of OCIs: "biased ground rules," "unequal access to information," and "impaired objectivity." *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007). All of these OCIs exist here. The Air Force, however, performed a belated OCI Review after AAR filed its GAO protest and failed to recognize that Taber's role

performing as a systems engineering support subcontractor on the 2014 Contract and Task Order 13 gave rise to all three categories of OCIs.

**First**, during that Review, the Air Force recognized that "Taber materially contributed to the technical data package [that] became part of Next-Gen cargo pallet specification" and in that sense "set[] the ground rules for the Next-Gen Cargo Pallet follow on production contract," and therefore had a biased ground rules OCI. AR Tab 75 at 2400. Despite this finding, the Air Force ignored well-established OCI principles governing the participation of systems engineering contractors in production contracts, and attempted to characterize Taber's performance of systems engineering and technical assistance ("SETA") work on an RFP preparation contract as performance of "development and design work." The Air Force also attempted to minimize Taber's role by erroneously arguing that multiple contractors participated in development of the technical specifications. The Air Force's flawed interpretation of the FAR's OCI rules (and GAO's acceptance of that interpretation) conflicts with the purpose of these exceptions in the FAR and is so broad that it would virtually eliminate the biased ground rules OCI as a meaningful limitation on contractor conflicts of interest.

**Second**, the Air Force ignored Taber's impaired objectivity OCI created by Taber's potential dual role in (a) materially contributing to the TDP and specifications and (b) serving as the manufacturing contractor under this RFP. Instead, the Air Force's OCI Review depends on its unsupported hunch that Taber would act properly in performing this contract. The FAR's OCI regulations do not permit agencies to rely on unsupported hunches in the face of such a significant OCI and instead require agencies to mitigate actual and potential OCIs.

**Third**, the OCI Review failed to meaningfully consider and, in fact, ignored all evidence demonstrating that Taber had an unequal access to information OCI, instead choosing to rely on

conclusory, *post hoc* assurances from UDRI, Taber, and Air Force personnel that Taber did not have unique access to competitively useful information. Those assurances fail to support the reasonableness of the Air Force's OCI Review and are contradicted by the record.

In short, as demonstrated below, the Air Force's OCI Review reached an arbitrary and irrational conclusion regarding Taber's biased ground rules OCI and failed to meaningfully consider Taber's impaired objectivity and unequal access to information OCIs.

### 1. The Air Force Admitted that Taber Has a Biased Ground Rules OCI Based on Taber's Material Contributions to the RFP's Specifications

The obligation of procuring agencies to avoid OCIs is a fundamental principle in federal procurement. More than 50 years ago, the federal government began to recognize "the undesirability, for industry and government alike, of placing a contractor in a position of an 'inherent conflict of interest, i.e., one in which there might be an opportunity to favor one's own capabilities or products in any future procurement'" – where the contractor has what is now referred to as a biased ground rules OCI. *See* J. W. Taylor, *Organizational Conflicts of Interest in Department of Defense Contracting*, 14 Pub. Cont. L.J. 158, 163 (1983). In particular, the government focused on contracts for systems engineering and technical direction. *See id.* In developing these rules, the government's concern was not that a contractor who has performed research and development on a new product could obtain an unfair head start compared to its competitors, but instead was that contractors performing systems engineering and technical direction work might do so "in such a way as to favor [their] prospects for later production of 'hardware items.'" Robert S. Pasley, *Organizational Conflicts of Interest in Government Contracts*, 1967:1 Wis. L. Rev. 5, 10 (1967). In other words, if a "contractor was placed in the position of determining the nature of work which the government would require, he could favor himself in its ultimate procurement, or he could direct the placement of such work with himself

19

or an affiliate." *See* J. W. Taylor, *Organizational Conflicts of Interest in Department of Defense Contracting*, 14 Pub. Cont. L.J. at 163. Because the government had "no desire" to rely on a contractor who might be biased or end up favoring its own products or capabilities, the Department of Defense issued a directive entitled Rules for the Avoidance of Organizational Conflict of Interests. *See id.*; DoD Directive 5500.10 (June 1, 1963). These rules ultimately became FAR Subpart 9.5. *See* FAR Subpart 9.5; *NetStar-1*, 101 Fed. Cl. at 527 n.22.

Today, the rules governing these "biased ground rules" OCIs are set forth in FAR 9.505-1 and FAR 9.505-2. As this Court has articulated, a biased ground rules OCI exists where "a firm has set the ground rules to some degree for another government contract, for example, by providing systems engineering and technical direction or preparing specifications or work statements to be used in a competitive acquisition." *Vantage Assocs. Inc. v. United States*, 59 Fed. Cl. 1, 10 (2003) (citing FAR 9.505-1 and FAR 9.505-2).

FAR 9.505-1 recognizes that contractors providing the government "systems engineering and technical direction" for a system "occup[y] a highly influential and responsible position in determining a system's basic concepts and supervising their execution by other contractors." As a result, unless a contractor that performs this type of work "ha[s] overall contractual responsibility for [the system's] development, [] integration, assembly, and checkout, or its production" the contractor "shall not be awarded a contract to supply the system or any of its major components; or be a subcontractor or consultant to a supplier of the system or any of its major components" because this contractor would be in "a position to make decisions favoring its own products or capabilities." FAR 9.505-1.

The FAR also recognizes that agencies "should normally prepare their own work statements" because contractors that assist the government in drafting work statements and

specifications are in a position to skew a later competition in favor of their own capabilities. Thus, "[t]o overcome the possibility of bias," FAR 9.505-2(b)(2) cautions that when the government requires contractor assistance to ***draft*** an RFP, "contractors are prohibited from supplying a system or services acquired on the basis of work statements growing out of their services, unless excepted in paragraph (b)(1) of" FAR 9.505-2. *See also* FAR 9.505-2(a)(2).

Here, the Air Force's OCI Review concluded that Taber had a biased ground rules OCI, stating that "Taber materially contributed to the technical data package [that] became part of Next-Gen cargo pallet specification" and in that sense "set[] the ground rules for the Next-Gen Cargo Pallet follow on production contract." AR Tab 75 at 2400. These material contributions include contributions to the drawings for the pallet, the MIL-DTL-27443G Detailed Specification, and other information provided by Taber in its role as the extrusion subcontractor supporting UDRI's acquisition support and systems engineering work. The Air Force even concluded that it was "plausible" that "Taber could have unintentionally skewed the competition towards itself" by preparing materials that were incorporated into this RFP. *See id.*, 2399. As a result, this actual OCI should have been evident to the Air Force long before AAR's GAO protest, and should have resulted in Taber's exclusion from competition for this Next-Gen Pallet production contract.

Specifically, the Air Force OCI Review revealed that Taber had material input into the TDP for this RFP, including the extrusion width, and extrusion die design, and potentially other aspects of the RFP's technical specifications based on its key role in assisting UDRI with assessing various alternatives (Plans A through D) – specifically lending its expertise to evaluate manufacturing failures and propose design revisions. *See id.*, 2399-00, 3397.

The Air Force's OCI review also concluded that evidence of Taber's input skewing the competition was available as early as December 15, 2017.  This is when industry repeatedly raised concerns about fairness because Taber was the only domestic source for aluminum extrusions of the size required by the then Next-Gen Pallet design that Taber helped develop. AR Tab 75 at 2399-00; *see also* AR Tab 27 at 329.

The Air Force, however, ignored those early signs and instead barreled ahead despite the serious concerns raised by potential offerors about Taber's unfair and improper influence on the TDP.  *See* AR Tab 53 at 1016 (noting concerns raised by seven potential contractors regarding the anticipated dimensions for the Next-Gen Pallet).[3]  During May 2019 pre-solicitation meetings the Air Force was again reminded that Taber had already improperly influenced the specifications because Taber was the only North American source for the intended extrusion design due to the width of the extruded panels.  *See* AR Tab 58 at 1024.

Therefore, the record before GAO demonstrated that, not only had Taber materially contributed to the TDP as concluded by the CO, but the Air Force also knew that Taber's input into the RFP had resulted in an improper impact of Taber favoring its own capabilities. Although the Air Force ultimately amended certain aspects of the drawings so that Taber is no longer the only capable source for pallet panel extrusions, the Air Force ignored the much larger issue – the facts before it left no doubt that Taber had a biased ground rules OCI.  *See* AR Tab 65 at 1304, 1313, 249, 1360.

---

[3] Several potential offerors raised concerns about the anticipated pallet dimensions in one-on-one meetings with the Air Force.  For example, ███████████ noted that it was "[c]oncerned about the 22" extrusions and current TDP" because "Taber is the only one with the current capability to handle the 22" extrusion and the FA would take at least 18-24 months to complete because everyone in the industry would have to go through the exact same process as did UDRI and Taber in order to be competitive."  AR Tab 53 at 1016.

In short, the Air Force's conclusion that "Taber contributed materially to the TDP and, in some sense set[] the ground rules for the Next-Gen Cargo Pallet" procurement should have ended this matter and resulted in excluding Taber from the competition.

> **a.** **The Air Force Erroneously Concluded that Taber Qualified as a "Development and Design" Contractor.**

Despite its biased ground rules finding, the Air Force determined that, pursuant to FAR 9.505-2(b)(1)(ii), the OCI rules do not apply to Taber because Taber "participated in the development and design work" for the Next-Gen Pallet.  Ignoring the glaring flaws in the Air Force's application of these exceptions, GAO accepted the Air Force's conclusions regarding the application of the "development and design" contractor exception in a decision suffering from fundamental legal and factual errors.  The Air Force's reliance on the "development and design" exception, however, is consistent with neither the law nor the administrative record.

The "development and design" exception in FAR 9.505-2(b)(1)(ii) states that if a contractor "prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services-or provides material leading directly, predictably, and without delay to such a work statement-that contractor may not supply the system, major components of the system, or the services unless . . . (ii) It has ***participated in the development and design work*** . . . ."  FAR 9.505-2(b)(1)(ii) (emphasis added).  The FAR makes clear that the exception is limited, noting that "[i]n development work, it is normal to select firms that ***have done the most advanced work in the field***" and that "[t]hese firms can be expected to design and develop around their own ***prior knowledge***."  FAR 9.505-2(a)(3) (emphasis added).

Although the FAR does not further define "development and design work," the FAR provides examples of development and design work, noting in FAR 9.508(c) that where a company "develops new electronic equipment and, as a result, prepares specifications," it is a

development and design contactor that may supply the equipment.  *See* FAR 9.508(c).  Likewise,

in circumstances very similar to the facts here, another FAR 9.508 example finds that the

contractor may not be awarded a follow-on contract.  FAR 9.508(f) states:

> Company A receives a contract to define the detailed performance characteristics
> an agency will require for purchasing rocket fuels.  Company A has not developed
> the particular fuels.  When the definition contract is awarded, it is clear to both
> parties that the agency will use the performance characteristics arrived at to
> choose competitively a contractor to develop or produce the fuels.  Company A
> may not be awarded this follow-on contract.

This example clearly applies here.  The UDRI/Taber team performed contracts in which

they were tasked to contribute to defining the requirements of the Next-Gen Pallet for this

production contract.  What is critical is that ***neither UDRI nor Taber had developed this***

***particular pallet*** – they had no "prior knowledge" or "advanced work in the field."  To the

contrary, they were tasked with updating ***existing*** specifications for the 463L Cargo Pallet solely

to prepare a TDP for this ten-year production contract, while maintaining the form, fit, and

function of the 463L pallet.  *See*, *e.g.*, AR Tab 100 at 2498.  At the time of award, there was no

question that the Air Force would use the resulting specifications to competitively award a

production contract.  As the above two FAR examples demonstrate, the exception for a

"development and design work" contractor is intended to apply to a contractor who developed

and designed a new product.  In contrast, where, as here, a contractor "has not developed" the

particular item and is tasked specifically and only with defining the technical specifications and

requirements for a competitive procurement, which FAR 9.508(f) describes as a definition

contract, then the "development and design" exception does not apply and the offeror must be

excluded from the later competitive procurement.

The Air Force, in relying on the development and design exception, also failed to

recognize that the exception does not apply to systems engineering and technical direction

contracts under FAR 9.505-1.  The FAR defines "system engineering" as including a

combination of "substantially all of the following activities: determining specifications, . . .

developing test requirements, evaluating test data, and supervising design."  FAR 9.505-1(b).

Technical direction includes a combination of "substantially all of the following activities:

developing work statements, determining parameters, . . . and resolving technical controversies."

*Id.*  The FAR includes the following example addressing this OCI rule at FAR 9.508(a):

> Company A agrees to provide systems engineering and technical direction for the
> Navy on the powerplant for a group of submarines (i.e., turbines, drive shafts,
> propellers, etc.).  Company A should not be allowed to supply any powerplant
> components.

> Both contracts awarded to the UDRI/Taber team called for providing systems

engineering and technical direction, to include determining the specifications, developing test

requirements, evaluating test data, determining parameters, and resolving controversies.  *See*

FAR 9.505-1(b) (defining systems engineering and technical direction).  In fact, UDRI's

proposal for the 2014 Contract expressly refers to its anticipated work as a "Systems Engineering

Process" effort (AR Tab 109 at 2886) and Task Order 13 calls for acquisition support services

and engineering support (AR Tab 76 at 2456 & Exhibit 1).

Taber's contributions to the TDP included providing engineering support services by

assessing the suitability of several design alternatives to meet tolerance and production

requirements, and assisting with "manufacturing process improvement" for the tie-down ring and

"manufacturing process maturation."  These contributions constitute textbook examples of

systems engineering and technical direction, which the FAR states is the basis to exclude a

contractor from a follow-on supply contract.  *See Filtration Dev. Co., LLC v. United States*, 60

Fed. Cl. 371, 379 (2004), *petition for enforcement denied*, 63 Fed. Cl. 418 (2005) (holding that

the CO failed to mitigate offeror's OCI where that offeror provided systems engineering and

technical assistance by "prepar[ing] for and participat[ing] in meetings to generate . . . project ideas[,] provided input to rewrite [an] Airworthiness Impact Statement, and reviewed Standard Operating Procedures on the new Airworthiness Impact Statement Document"). In those circumstances, the FAR makes clear that such contractors "should not be in a position to make decisions favoring its own products or capabilities" and, therefore, should be precluded from a follow-on procurement to supply the product (or any of its major components). FAR 9.505-1(b). The Air Force, however, never considered that the nature of Taber's work fell within this specific OCI rule and arbitrarily misapplied the development and design exception.

This Court has also weighed in on the application of the development and design exception, explaining that it is reserved for those contractors that have "overall contractual responsibility for . . . the system's development, integration, assembly, checkout, and production." *Vantage Assocs.*, 59 Fed. Cl. at 11-12. For example, in *Vantage Associates*, the Court explained that Raytheon was not precluded from supplying radomes to support the PHALANX program (a weapons system) because Raytheon, as the manufacturer and designer for the entire system, including radomes, had the prior knowledge and was "an entity with overall contractual responsibility for the . . . system's development, assembly, checkout, and production." *Id.*

Here, in contrast, Taber does not have "overall contractual responsibility" for the Air Force's pallet program – it was not involved in the development of the legacy 463L pallet or the all-aluminum pallet. Instead, in its role as a subcontractor to UDRI, Taber's role was limited to materially contributing to the government-owned TDP for this competitive procurement, giving rise to an immitigable OCI. Therefore, the Air Force failed to comply with the OCI rules set forth in FAR 9.505-1 and FAR 9.505-2 and improperly relied on an expansive and unsupportable

interpretation of the "design and development" contractor exception – an interpretation that eviscerates the FAR's prohibition against biased ground rules OCIs.

If this Court were to endorse the Air Force's reasoning, the exemption would swallow the rule, and result in the illogical scenario where every time the Government relies on the assistance of a private contractor to update a TDP, those services would be exempt from the FAR's prohibition against using contractors with biased ground rules OCIs.

### b.    GAO Also Misapplied the Development and Design Exception

Although GAO denied AAR's protest of the Air Force's application of the development and design exception, this Court reviews each protest ground *de novo* and owes the GAO decision no deference.  *See Data Mgmt. Servs. Jt. Venture v. United States*, 78 Fed. Cl. 366, 371 n.5 (2007) (stating that GAO's "decision with respect to any particular procurement is given no deference" and that the court's "review is de novo").  In any event, GAO's analysis of this issue is similarly flawed and only highlights the problems with the Air Force's strained expansion of the "development and design" exception to the OCI rules.

**First**, GAO's reliance on the development and design exception significantly departs from prior precedent.  In denying AAR's protest, GAO endorsed the Air Force's untenable use of the "development and design" exception to apply solely to Taber's work in contributing to the very solicitation on which it would be competing for award of a production contract.  Neither this Court nor GAO has read this exception to broadly exempt firms from any OCI prohibitions where the only so-called "development and design" work involved materially contributing to the solicitation at issue.  Although FAR Subpart 9.5 does not automatically disqualify firms with "prior knowledge" and "advanced work" in the agency's ongoing program from competing for successor contracts, it does disqualify those firms in a position to favor their own work in the development of statements of work in those follow-on contracts.

27

For example, in *Ressler Associates, Inc.*, B-244110, Sept. 9, 1991, 91-2 CPD ¶ 230, GAO recognized that Ressler had participated in prior design and development efforts and found that this work alone did not result in an OCI. Instead, GAO found that the OCI – the unfair advantage – arose from Ressler's role in preparing the specifications for the solicitation at issue. As GAO explained in concluding the exception did not apply:

> The language of the provision . . . plainly contemplates the situation where a firm wishes to compete for a contract for a system or services based on that firm's **earlier development and design work**. *See* FAR § 9.505–2(b). The competitive advantages afforded the contractor in such situations are not prohibited as unfair because they are both unavoidable and advantageous to the government. . . . [Here,] **the competitive advantage Ressler obtained was due to its participation in preparing the statement of work, not its performance of a prior contract**. Thus, the improper advantage in issue had nothing to do with the rationale underlying the exception, and thus was not covered by it.

*Id.* at *2 (emphasis added). Taber's work, much like the performance in *Ressler*, is an advantage arising from the fact that it "contributed materially to the TDP" for this procurement under UDRI's prior contract. Taber's advantage does **not** arise from the development of a new product by Taber whose specifications were provided to the Air Force – because Taber **did not** develop a new product. *See also Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 512 (2018) (finding that OCI did not arise based on prior work under Pilot Study under "development and design" exception where contractor "was not directly involved in drafting the . . . Solicitation"); *Lucent Techs. World Servs., Inc.*, B- 295462, Mar. 2, 2005, 2005 CPD ¶ 55 at *6 (finding that "development and design" exception inapplicable where contractor was "not developer of the . . . technology itself," but only prepared "device specifications for the procurement").

In this protest, however, GAO failed to recognize this important distinction and applied a confused interpretation of this exception that would allow the exception to swallow the rule, scuttling the protections granted by the biased ground rules OCI provision by allowing

contractors to compete for the very solicitations for which they were hired to prepare (or "develop") and ignoring their opportunity to tailor the RFP to favor their own capabilities.

**Second**, GAO's application of the exception was based on its erroneous characterization of UDRI and Taber's contract obligations under the 2014 Contract while steadfastly ignoring the follow-on acquisition support services also provided under Task Order 13. GAO's decision states that "the record reflects that the Next-Gen Pallet did not exist before UDRI and Taber developed and designed it under UDRI's development contract," and "the fact remains that [in addition to preparing an delivering the Next-Gen Pallet drawings] UDRI was also required to develop, design, and deliver a new product here, as evidenced by the Next-Gen pallet prototypes." *AAR Mobility Sys.*, 2020 CPD ¶ 106 at *6. Relying on this mischaracterization, GAO analogizes UDRI's and Taber's efforts to the example in FAR 9.508(c) which provides that where "Company A develops new electronic equipment and, as a result of this development, prepares specifications. Company A may supply the equipment." *Id.* at *5.

GAO is wrong. Contrary to GAO's recitation of the facts, Taber's efforts on the 2014 Contract are not akin to "Company A" in this example – Taber did not develop new equipment and then, after this development, prepare the specifications. In fact, the 463L pallet existed for decades and the Next-Gen Pallet is a form, fit and function replacement for the legacy pallet, with the same size proportions. To the product's end user, as UDRI's proposal explained, the Next-Gen Pallet appears identical to the existing pallet except that it is 12 pounds lighter. AR Tab 109 at 2891-92. In other words, Taber was simply part of the team hired to prepare the updated specifications for an anticipated production procurement of the replacement. The agency record also confirms that the Next-Gen Pallet did not even originate with Taber. Rather, the Air Force Life Cycle Management Center (AFLCMC) initiated a feasibility study to study

alternatives and/or replacements for the legacy pallet design. In August 2012, the Air Force awarded a contract to UDRI to conduct this feasibility study, including alternative supplier, materials, and designs to the legacy 463L pallet. *See* AR Tab 105 at 2678. According to the report submitted by UDRI under the subsequent 2014 Contract, "███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████." *Id.* (emphasis added). In fact, nothing in the AR or in the Air Force's OCI Review indicates that Taber performed any purported development and design work on the Next-Gen Pallet – either under a different government contract or at private expense – beyond the two described systems engineering support subcontracts that provided input into the TDP.

As a result, not only was Taber's role in defining the requirements for this procurement by contributing to the TDP analogous to the example in FAR 9.508(f), but it was also analogous to another OCI example set forth in the original 1963 OCI rule, when the Government began to recognize the risk posed by contractors with biased ground rules OCIs. The rule provided:

> *Example A.* Company A prepares updated Government specifications for a standard refrigerator to be procured competitively. Company A shall not be allowed for a reasonable period to compete for supply of the refrigerator.

32 C.F.R. § 141.2(b)(2)(iii) (1965). Like Company A, Taber contributed to the updated specifications for the 463L pallet, specifically for the purpose of a competitive procurement.

**Third**, the Air Force's and Taber's admissions demonstrate that Taber was not a "development and design" contractor and therefore contradict GAO's attempts to apply the exception here. The Air Force, for example, repeatedly admitted that the purpose of the 2014 Contract and Task Order 13 was to draft specifications for this procurement. The 2014 Contract states that the contractor was to "develop a TDP for follow on production of the Next-Gen Cargo Pallet," not for development of a new pallet for the Air Force. AR Tab 100 at 2498. The OCI

Review reach the same results, concluding that the "objective of the [2014] contract was to develop a TDP for follow on production of the Next-Gen Cargo Pallet." AR Tab 75 at 2401. Taber's role was further focused on producing and refining the extrusion specifications for the Next-Gen Pallet RFP. AR Tab 100 at 2499. In fact, the CO conceded that the "development and design" exception could not apply to Taber, stating that he did "not believe that Taber was directly and extensively involved in the development of the specifications underlying the procurement," but that Taber met the OCI restriction at FAR 9.505-2(b) because Taber had "contributed materially to the TDP and, in some sense set, the ground rules for the Next-Gen Cargo Pallet follow on production contract." AR Tab 75 at 2400.

Likewise, during the OCI investigation, Taber's representatives disclaimed any role in development and design work, while admitting that Taber's role consisted of receiving the UDRI drawings and TDP and revising them for use in Next-Gen RFP. AR Tab 75 at 2451-52. Taber also admitted that its role had nothing to do with actually developing an all-aluminum pallet because the pallet was already set out in drawings and detail specifications that UDRI and Taber were updating in performing the 2014 Contract and Task Order 13. *Id.*; *see* AR Tab 100 at 2499-00 (describing the scope of the UDRI contract). As a result, the factual record directly contradicts the Air Force's and GAO's attempts to apply the development and design contractor exception here.

**Finally**, GAO attempted to rationalize its decision by mischaracterizing AAR's GAO pleadings, stating "AAR, in its initial protest repeatedly acknowledges that UDRI's 2014 Contract was a developmental effort." *AAR Mobility Sys.*, 2020 CPD ¶ 106 at *6. This assertion makes no sense and is based on GAO's misinterpretation of the single term "development." For example, FAR 9.505-1(b) includes numerous examples of "development effort" in the context of

systems engineering, such as "developing work statements," or "developing test requirements," but those are examples of activities *creating an OCI, not an exception*. GAO was again ignoring the record before it. Although UDRI's 2014 Contract was called a "development" contract, it was a contract for developing the RFP by defining the requirements of a future competitive procurement, and therefore does not fall within the "development and design" contactor OCI exception. *See* AR Tab 72 at 1653 ("The contract specifically required Taber's involvement in the requirements definition process for the current procurement."); *id.*, 1660 ("Despite its participation in the requirements definition of this RFP, AAR understands that Taber may participate in the instant procurement, . . . ."); *id.*, 1662 ("In fact, publicly available information indicates that Taber was involved in defining the requirements for the Next-Gen pallet RFP . . . ."). These are precisely the types of regulatory-defined tasks for systems engineering and technical direction that create an unmitigable OCI under FAR 9.505-1.

For the reasons above, the Air Force's position and GAO's decision are wrong on the law and the facts, and result in an untenable expansion of the "development and design work" exception. This exception to the biased ground rules OCI regulation is not applicable to Taber's role in developing/drafting the Next-Gen Pallet RFP technical specifications. Because the exception does not apply here, AAR has demonstrated success on the merits.

### c. The Multiple Contractor Exception is Inapplicable

The Air Force also arbitrarily and irrationally relied on what the Air Force refers to as the "multiple contractors" exception to the FAR's OCI rules. Where, as here, Taber was the only extrusion contractor that materially contributed to the technical specifications for this procurement, the multiple contractor exception does not apply.

FAR 9.505-2(b)(1)(iii) includes an exception to the exclusion of offerors that prepare specifications for procurements, where "[m]ore than one contractor has been involved in

preparing the work statement." In this situation, the government is typically obtaining input on its technical requirements through an open information call rather than a task order under an existing contract and those multiple perspectives attenuate the concerns about bias and unfair competitive advantage.

Here, the Air Force's attempts to rely on this OCI exception are misguided and arbitrary for a very simple reason: it didn't work – the Air Force itself has admitted that this purported exception failed to protect against the twin evils of bias and unfair competitive advantage. As discussed above, after the Air Force publicly released the draft TDP, multiple potential offerors explained to the Air Force that Taber had skewed the TDP requirements to favor itself and its specific production capabilities. Although this forced the Air Force to make changes to the TDP to blunt one obvious unfair advantage afforded to Taber, this half-measure by the Air Force fails to restore public trust in the integrity of this procurement or address the very likely fact that Taber has skewed, intentionally or not, other aspects of the ground rules in its favor. Because this exact scenario is one of the underlying policy reasons for the OCI regulations, the Air Force has failed to fulfill its regulatory obligations under FAR 9.504 and 9.505 to protect against actual or potential OCIs to maintain confidence in the fairness of Federal procurements.

Moreover, the exception does not apply because UDRI itself admits that none of the other contracted vendors had any input into the work statement or technical specifications, stating:

> To the extent that Taber assisted in manufacturing prototype extrusions and contracting with other vendors for fabrication of prototype, demonstration, and Operational Test and Evaluation Next-Gen cargo pallets, and UDRI's design evolution logically followed from and during that activity, *other vendors also participated in prototyping, fabrication, welding, forging and other activities, but did not drive any design or specification decision.*

AR Tab 75 at 2410 (emphasis added).  Because these other vendors were not involved in preparing, or materially contributing to, the technical specifications, their involvement does not trigger the multiple contractors exception in FAR 9.505-2(b)(1)(iii).

Even if – contrary to the record – those other subcontractors had been involved in preparing the technical specifications for this procurement, the multiple contractors exception specifically ties the presence of multiple contractors to those providing input into the specification *in the same area as the challenged contractor*, making clear that the intent of the rule is to an ensure offeror is not excluded where the offeror was not in a position to favor itself in drafting the technical specifications.  In *Systems Made Simple, Inc.*, B-412948.2, July 20, 2016, 2016 CPD ¶ 207, for example, the agency engaged two companies (the awardee's affiliate, Accenture, and McKinsey) to perform exactly the same assessment study of the agency's operations; in fact, the record showed that the agency had contracted with the second company, McKinsey, to perform the same review as Accenture because the agency needed additional input for the PWS for the follow-on procurement.  *Id.* at 8-9.  Likewise, in *American Artisan Productions, Inc.* B-292559, B-292559.2, Oct. 7, 2003, 2003 CPD ¶ 176, GAO found that multiple contractors prepared the planning and design development work for museum exhibits at two sites, including HDM, who was a proposed teammate of the awardee. *See id.* at *8.  There, GAO found that the dual role of HDM in contributing the specifications and in teaming with the awardee did not create a conflict because HDM did "not perform the type of work solicited" and, therefore, "was not in a position to draft specifications favoring its own products."  *Id.* at 9.

The facts here are inapposite to past applications of the multiple contractors exception. The Air Force contended that the mere presence of other contractors in the RFP development effort, none of which were aluminum extrusion companies, mitigated the significant potential for

Taber to favor its own products and services in the input it had into the aluminum extrusion technical specifications. *See* AR Tab 75 at 2401-02. At GAO, the Air Force misleadingly referred to "multiple subcontractors who were subcontracted to manufacture pallets," when actually these companies were a collection of specialists that provided input in specific areas of expertise – only Taber had aluminum extrusion capabilities. *See id.*; AR Tab 106 at 2805.

The Air Force's OCI Review, however, made clear that, if anything, these other companies provided input into the prototyping and fabrication process only in their specific and limited areas of expertise, primarily Manufacturing Technology Incorporate (MTI) (a friction stir welder) and HF Webster/Wolverine (a replacement friction stir welder that was a subcontractor to Taber). *See* AR Tab 75 at 2401-02; *see also* AR Tab 106 at 2805 (listing the same vendors and areas of expertise). Even if these other contractors had supported the RFP development effort, which they did not, their support did not involve the aluminum extrusion technical specifications. AR Tab 75 at 2401 ("UDRI also had substantial involvement with Modern Forge, the manufacturer of the Tie Down Ring, and Hines Precision, Modern Forge's subcontractor, which had to [redesign] the Tie Down Ring to better meet Air Force requirements."). As a result, even if Taber was not the only contractor that provided input into the technical specifications, the OCI rules continue to apply here because Taber was the only aluminum extrusion contractor that provided input and the only extrusion contractor in a position to favor itself.[4] *See* AR Tab 75 at 2399-01.

---

[4] While not considered in the Air Force's OCI Review, UDRI's involvement does not create a second contractor (Taber and UDRI) to apply the "multiple" contractors exception under FAR 9.505-2(b)(1)(iii) because UDRI lacked any experience in aluminum extrusions. *See* AR Tab 75 at 2399, 2409; AR Tab 100 at 2499 (requiring UDRI to retain an aluminum extrusion subcontractor). In any event, the Air Force admitted in its OCI Review that UDRI submitted technical specifications that still favored Taber's capabilities and excluded multiple domestic aluminum extrusion companies from participating in this procurement. AR Tab 75 at 2399-00.

(continued …)

The Air Force also attempted to classify general market research as the basis for the multiple contractor exception, but did not link those "industry representatives" to any input into the technical specifications, much less the specific extrusion specifications. *See* AR Tab 75 at 2402. As made clear by declarations obtained by the Air Force during the OCI Review, these industry representatives did not make changes to the technical specifications. *See*, *e.g.*, AR Tab 75 at 2409. Moreover, although UDRI's Daniel Bowman asserted that he "consulted" with other extruders (AR Tab 75 at 2409), the AR demonstrates that those alleged extruders made no contributions to the TDP or any of UDRI's other deliverables. AR Tab 106. The only mention of those alleged extruders is in Mr. Bowman's affidavit. For this exception to apply, the FAR requires more than just consulting with multiple contractors; it requires more than one contractor to have "been involved in preparing the work statement." FAR 9.505-2(b). The AR demonstrates that none of these other industry representatives had such involvement; instead, only one extrusion contractor had the ability to and did provide input into the technical specifications that favored its own products and services – Taber.

The GAO decision relegated this argument by the Air Force to a footnote. In adopting the Air Force's flawed conclusion, GAO sidestepped the critical fact – UDRI's concession that Taber was the only extrusion subcontractor and the only one who had any input into the technical specifications – and instead opted for the 50,000 foot view, asserting that "the 'work statement' was the complete Next-Gen Pallet TDP and more than one contractor was involved in its preparation." *AAR Mobility Sys.*, 2020 CPD ¶ 106 at *8 n.8. Not only did GAO's analysis ignore UDRI's concession, it is fundamentally flawed because GAO ignored the purpose of the

---

Thus, UDRI's involvement in the technical specification development was insufficient to counteract the actual or potential OCIs arising from Taber's role and, therefore, cannot satisfy the multiple contractor exception in FAR 9.505-2(b)(1)(iii).

OCI rules and its prior decisions, providing that these rules are designed to protect against the twin evils of bias and unfair advantage.  The mere fact that UDRI had subcontracted with two other friction stir welders does not warrant application of this exception because, as demonstrated by the AR, those entities worked in areas separate from Taber and did not drive any design or specification decisions; Taber, on the other hand, had the unimpeded ability to "be in a position to favor its own products or capabilities" in materially contributing to the TDP. FAR 9.505-2(b)(2); *see* FAR 9.505-1(b) (applying OCI rules where contractor occupies "highly influential position"); FAR 9.508(a) (OCI example applying OCI rules to specific "powerplant" system and components for which "Company A" provided SETA assistance to the Navy).

As a result, this broad application of the multiple contractor exception would swallow the rules designed to protect against the dangers of biased ground rules OCIs.  If the Court were to adopt this interpretation of the multiple contractor exception, procuring agencies could simply point to general unrelated input into technical specifications or market research to avoid the application of the FAR's OCI rules for systems engineering and technical assistance contractors.

*        *        *

In short, the Air Force's OCI Review properly found that Taber had a biased ground rules OCI, but came to an unsupportable conclusion that, despite Taber's material contributions to the RFP's technical specifications, it was still eligible to compete based on clearly inapplicable exceptions to the biased ground rules OCI regulations.  As a result, the Air Force violated its obligations under FAR 9.504 to neutralize or mitigate significant potential OCIs, and AAR's protest has achieved success on the merits.

2. **Despite Recognizing the Significant Potential Impaired Objectivity OCI, the Air Force Failed to Avoid, Neutralize, or Mitigate the OCI**

Taber also suffers from an impaired objectivity OCI because, if awarded this production contract, Taber will be in a position to evaluate the TDP to which it materially contributed under its prior contracts. An impaired objectivity OCI arises when a firm's ability to render impartial advice to the government would be undermined by the firm's competing business interests. *See Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011). Under FAR 9.505, procuring agencies must evaluate and neutralize potential impaired objectivity OCIs due to the risk that, *inter alia*, the awardee might "pull its punches" in performing a contract that involves review of its prior work in order to avoid suffering an adverse impact (such as a lower past performance score or negative monetary impacts).

Although design advice is not the main purpose of this production contract, the contract contemplates potential changes in the design, fabrication, assembly, materials, and processes in the Detailed Specification. *See* AR Tab 65 at 1181. The RFP specifically anticipates that the awardee can propose changes in "design, fabrication, assembly, part, material, process, or source of supply," in particular where the awardee identifies a "system safety risk." *Id.* The contractor also has a separate and ongoing obligation to implement quality control functions, including an obligation to provide monthly lot sample test reports to the Air Force. *Id.* at 1180. Each of these required tasks constitute important quality and safety checks on the production process and ensure that design problems are not carried through to full rate production.

If Taber is awarded this contract, however, it would be placed in the dual role of "contribut[ing] materially to the TDP" that was subsequently incorporated into this RFP and then assessing the quality and safety of the TDP. Taber's performance of its contractual obligations to objectively identify system safety issues and monitor production quality would be impaired,

because Taber might be reluctant to question the merit of the TDP to which it had materially

contributed. The risks to Taber in doing so could include negative reflections on its competence

and damage to its relationship with the agency.  This scenario presents the exact types of risk

against which the OCI rules aim to protect.  *See, e.g., ASM Research*, B-412187, Jan. 7, 2016,

2016 CPD ¶ 28 at *3 (potential impaired objectivity OCI exists where contractor awardee would

be left with the choice of assigning responsibility for the failure to itself, as the infrastructure

contractor on a previous contract, or to a third-party developer).

     This OCI puts the entire production contract at risk because it creates the risk that the

Government will spend millions of dollars to remedy issues that went unidentified and

uncorrected. An impartial contractor, on the other hand, could preemptively identify a problem

with the TDP and propose an engineering change to resolve the problem or conduct appropriate

production quality testing, in accordance with the production contract, to spot issues early.

Taber's objectivity in performing this contract is seriously impaired because it has an incentive

to avoid identifying issues with the design and production process that it helped create.

     Here, the Air Force's OCI Review recognized the potential for an impaired objectivity

OCI because the quality control and ECP clause in the production contract would put Taber "in

the dual role of producing a design that it had contributed to [and] assessing the quality of that

design."  AR Tab 75 at 2402-03.  The Air Force, however, failed to take any steps to mitigate

this potential OCI and instead the CO blindly trusted that Taber's conflict will not impact

contract performance, stating "I do not think that it is plausible this could affect the subject

acquisition."  *Id.* at 8.

     The CO's conclusion misses the whole point of the OCI regulations and is based on

unsupported assumptions which are insufficient to mitigate an identified OCI.  The CO offered

two "generalized" assumptions for dismissing this significant potential OCI. First, the CO assumes that, in the event that Taber identified a flaw in the TDP for which it was not responsible, Taber would not hesitate to step forward to identify that flaw and blame UDRI. *See* AR Tab 75 at 2403. Second, the CO claims that, because "government contractors are always eager to submit a change order and be paid for additional work," Taber would simply submit a request for an equitable adjustment. *Id.* These unsupported assumptions do not constitute a mitigation strategy as contemplated by FAR Subpart 9.5. *See Nortel Gov't Sols.*, B-299522.5 *et al.*, Dec. 30, 2008, 2009 CPD ¶ 10 at *5.

To begin with, the CO relies only on the factual scenario where Taber is not at fault, while ignoring those scenarios where Taber itself could be responsible due to its material contributions to the TDP. Similarly, although the CO relied on monetary incentives as a basis to dismiss any OCI concerns, the CO failed to consider that those same monetary interests could have the opposite effect – to the detriment of the Air Force. It is just as likely that Taber would have the same monetary incentives to remain silent regarding any flaws in the TDP if it feared that it would or could bear some responsibility for the flaw. Thus, this OCI jeopardizes the integrity of the safety and quality control functions that are crucial to meet the Air Force's needs.

This Court has explained that the "primary concern" of an impaired objectivity OCI is that "a firm might not be able to render impartial advice." *Turner Constr. Co.*, 94 Fed. Cl. at 569 (quotations and citation omitted). In assessing an agency's mitigation of a potential impaired objectivity OCI, GAO also has rejected as insufficient an agency's general assertions that it is confident that a contractor will "do the right thing," and put the interests of the agency above its own. For example, in *J&E Associates, Inc.*, B-278771, Mar. 12, 1998, 98-1 CPD ¶ 77 at *3, GAO rejected "[t]he agency's contention that no [OCI] would arise because the terms of the

solicitation require[d] the contractor to act in the interests of the service member and/or the government, not in the interests of its own institution," and stated that such an argument "misses the point of regulations governing organizational conflicts of interest." This is because the OCI "regulations contemplate that a potential organizational conflict of interest arises from a person (including a contractor's) relationship to other entities, regardless of the person's good faith and adherence to contract requirements." *Id.*; *see also NCI Info. Sys., Inc.*, B-412870.2, Oct. 14, 2016, 2016 CPD ¶ 310 at *10 (rejecting "generalized mitigation measures" in a solicitation as insufficient); *Johnson Controls World Servs.*, B-286714.2, Feb. 13, 2001, 2001 CPD ¶ 20 at *9 (holding that "*ad hoc* mitigation activit[ies]" are insufficient mitigation). This is why prior GAO and Court precedents have established the presumption that where a contractor is given the opportunity to favor its own interests over the interests of the Government, it is presumed to have done so, without having to demonstrate bad faith or specific biased input. *See Alion Sci. & Tech. Corp.*, B-297022.3, Jan. 9, 2006, 2006 CPD ¶ 2 at *5 ("[I]mpaired objectivity OCIs are created any time the performance of a contract requirement involves the contractor's exercise of judgment that could affect other contractor-related interests"). Thus, by ignoring the significant potential risk that Taber might "pull its punches" in the contract change proposal and quality testing roles, the Air Force failed to adhere to the FAR's OCI rules and, therefore, its OCI determination is arbitrary and contrary to law. *See Nortel Gov't Sols.*, B-299522.5 *et al.*, Dec. 30, 2008, 2009 CPD ¶ 10 at *3; *DRS Tech. Servs., Inc.*, B-411573, B-411573.3, Nov. 9, 2015, 2015 CPD ¶ 363 at *11 (finding impaired objectivity OCI where agency failed to consider those Performance of Work areas obligating the awardee to report issues and inspect its own work).

GAO's analysis of this issue also fails to provide any comfort for the Air Force's deficient review. Although the Air Force's OCI Review found that Taber had materially

contributed to the TDP incorporated into this RFP, GAO irrationally assumed this critical fact away and claimed to "find no merit to these arguments" that Taber had a significant role in contributing to the TDP. *AAR Mobility Sys.*, 2020 CPD ¶ 106 at *11. GAO, however, is disputing the record and the very findings of the Air Force's OCI review. Moreover, by accepting the Air Force's platitudes about good faith incentives for Taber to do the right thing, GAO departed from its own precedent discussed above, which holds that the FAR's OCI rules are designed to address significant potential OCIs "regardless of the person's good faith and adherence to contract requirements." *J&E Assocs.*, 98-1 CPD ¶ 77 at *3.

Because the Air Force failed to comply with applicable law or rationally consider Taber's impaired objectivity OCI, AAR has demonstrated success on the merits.

### 3. The Air Force's Review of the Unequal Access to Information OCI Was Inadequate and Revealed Taber's Access to Non-Public Program Information Resulting in an Unfair Competitive Advantage

An unequal access to information OCI exists where a firm has access to nonpublic information as part of its performance of a government contract, and that information may provide the firm an unfair competitive advantage in a later competition for a government contract. FAR 9.505(b); *see, e.g., NetStar-1*, 101 Fed. Cl. at 520 (finding that the hard facts "strongly suggest[ed] the existence of an OCI" where the awardee had access to budget execution plan which included competitors' information). The question for this type of OCI is whether the contractor had access to nonpublic information as part of its performance of a government contract that may provide the firm a competitive advantage in a later competition. *Id.* This requires a careful review of the information that was actually provided to Taber. In *Turner Construction*, for example, the Federal Circuit affirmed this Court's OCI ruling because this Court had "concluded that the CO carefully assessed the information that AECOM may have

had access to" and considered whether the information was competitively useful and disclosed to all offerors. 645 F.3d at 1385.

Here, in sharp contrast to the requirements established by this case law, the CO's review of Taber's unequal access to information OCI was wholly inadequate because (a) the CO never determined the content of the information to which Taber had access, despite multiple, admitted interactions with the Air Force and (b) the CO ignored evidence in the record demonstrating that Taber actually had unfair access to nonpublic, competitively useful information related to the Air Force's technical evaluation of the NextGen Pallets. *See C2C Innovative Sol., Inc.*, B-416289, July 30, 2018, 2018 CPD ¶ 269 at *7-8 (sustaining a protest where the agency failed to evaluate awardee's access to nonpublic information or whether it might be competitively useful).

**First**, the Air Force failed to identify the actual information that was shared with Taber during its support of UDRI's systems engineering work. At GAO, the Air Force made the broad conclusory assertion that Taber "did not receive any competitively useful nonpublic information, let alone information that would have led to an unfair advantage." AR Tab 75 at 2407-54.

The record, however, is clear that the Air Force CO lacked the facts necessary to make this determination. The Air Force claims that the CO had relied on "affidavits of fourteen people that had a role in this procurement" and that those "affidavits establish that the Air Force had minimal contact with Taber throughout the development contract and this RFP and no competitively useful nonpublic information was passed to Taber." AR Tab 2 at 29. But a review of those affidavits reveals that the vast majority of them failed to disclose the content of the information to which Taber actually had access and instead relied on broad categorical "trust us" statements – precisely the same deficient approach used by the Air Force in reviewing the

impaired objectivity OCI.  *See* AR Tab 75 at 2412 (unsigned), 2414, 2416 (unsigned), 2418,

2420, 2423, 2425, 2427, 2429 (also stating he had no real contact with Taber), 2443.

For example, ten of those affidavits – some of which are not even signed – contained

nearly identical boilerplate language stating that the individual declarant concluded that he or she

did not receive or transmit non-public, source selection sensitive, or proprietary and confidential

information.  *See, e.g.*, AR Tab 75 at 2408.  The CO then relied solely on these conclusory, *post-*

*hoc* statements, without ever asking what information Taber had actually accessed during

performance of multiple subcontracts with UDRI.  This was flawed in at least two respects: it

assumes that (a) the affiants had perfect knowledge and memories of all information – written

and verbal – that was provided to Taber; and (b) all of the affiants had an accurate and valid

understanding as to what information was public, nonpublic, source selection sensitive, or

proprietary. In effect, the CO delegated his responsibilities under FAR 9.504 to the affiants,

allowing them to make their own subjective judgments about what is or is not "nonpublic" or

competitively useful information.  *See Turner Constr.*, 645 F.3d at 1382-86.

The Air Force's abdication of this responsibility to "identify and evaluate" the actual

information shared with Taber is particularly egregious because the Air Force's OCI Review

relied on conclusory and *post-hoc* assertions made in the context of AAR's bid protest.  The

Supreme Court has made clear that *post hoc* rationalizations offered by an agency should be

afforded limited weight in this Court's analysis and, as a result, are certainly not a sufficient

basis for the Air Force to fulfill its regulatory obligations under FAR 9.504.  *See Citizens to*

*Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971) (explaining that affidavits that were

"merely 'post hoc' rationalizations, which have traditionally been found to be an inadequate

basis for review." (internal citations omitted)).

44

Consistent with the Air Force's lack of interest in identifying the actual information shared with Taber, the Air Force CO also turned a blind eye to other affidavits establishing that, in performing as a subcontractor under Task Order 13, Taber was directly involved in UDRI's systems engineering support services for the Next-Gen Pallet during which time Taber had significant interactions with Air Force personnel.  *See* AR Tab 75 at 2446-48, 2453.  Those declarations, for example, confirm that Taber was engaged in meetings to support the Task Order 13 systems engineering work and "engaged in process improvement and cost reduction efforts focused on downstream full-production yield increases and price reductions and to demonstrate the process improvements over a trial production run of up to 500 pallets." *Id.*, 2453.  In other words, Taber admitted that it participated in the Task Order 13 contract, which was focused on further refining this RFP.  *Id.*  And, of course, during performance of that contract, Taber admitted that it had significantly more meetings with the Air Force.  *See id.*, 2447-48.

The Air Force CO failed to follow up on these admissions to identify and assess the content of the information that was shared in these 2017 and 2018 meetings, which occurred in connection with the Air Force's overall efforts to finalize this RFP for the production contract. *See id.*, 2420.  Indeed, the timelines in the Taber employee affidavits suggest that Taber was involved in the most recent changes to the draft RFP – the change to a 6-panel design – because the design was "relatively complete" in January- February 2019 when Taber participated in meetings with the Air Force and UDRI in January 2019.  *Compare id.*, 2420-21 *with id.*, 2448.

Similarly, the CO ignored numerous status reports and meeting agendas and minutes demonstrating that Taber had constant communications with UDRI and that Taber was intimately involved in meetings with the Air Force to resolve issues related to the extrusion designs.  *See* AR 3396-97, 3583.  This record shows that Taber's involvement necessarily gave it

access to information not shared with other offerors, but the CO failed to make any further inquiries and studiously avoided uncovering the specific content shared with Taber.

**Second**, the Air Force's OCI Review ignored "hard facts" demonstrating that Taber had unique access to competitively useful and other source selection information that the Air Force refused to disclose to all offerors. Not only did the Air Force fail to review the information to which Taber had access in support of the "process improvement and cost reduction efforts" for the Air Force's program, the Air Force's CO also ignored clear evidence in the record indicating that Taber had unique access to nonpublic information that multiple offerors viewed as competitively useful for preparing proposals to perform the production contract.

For example, under one contract, the UDRI/Taber team was tasked to perform "Test & Evaluation/Qualification Testing" for the 463L Next-Gen Pallet. This included developing "a Test Plan for T&E/Qualification of the Next-Gen cargo pallet," coordinating with Government personnel to conduct tests of manufactured samples to prepare a "Qualification Test Report," and repeating any failed tests. AR Tab 100 at 2499. Under the next contract, Task Order 13, UDRI and Taber continued to define the requirements for this RFP and were directed to perform other systems engineering work, such as work related to "manufacturing maturation process." *See id.*

In this procurement, offerors repeatedly requested access to the nonpublic, Government-owned data produced during these past contracts, explaining that access to such information would be competitively useful, as demonstrated by the following examples:

- "Please provide the design validation test results for the current TDP. It is imperative that bidders be able to see the results of the test to ensure their build produces a consistent result." [#21]

- "[P]lease provide any other test plans, test procedures, test reports, quality plans, manufacturing process documentation, MTBF data, and/or other proof (photographic/video/other) associated {or called by any other name} available for contract(s) FA851914C0004 and/or GS05Q15BMD0001 {or any other contracts associated with the All- Aluminum Friction Stir Welded 463L pallet development} to

prove pallets were Manufactured to this Technical Data Package; Tested to this Technical Data Package; and Passed all requirements of MIL-DTL-27443." [#25]

- "Can the Government please provide the design qualification test report?" [#57]

AR Tab 75 at 2420, 2477; AR Tab 53 at 1002-04, 1006. Taber, as UDRI's subcontractor under the 2014 Contract, provided pallets for qualifications testing, and as a result, had access to the testing procedures and test data. *See* AR Tab 105 at 2776. Under Task Order 13, Taber also had access to the data as it supplied UDRI with inspection reports for ████████████████. *See* AR 75 at 2400. Unlike any other offerors, Taber already knows what will be on the final exam – it has inside information about the testing procedures and the testing results prepared by UDRI for this RFP. That information is competitively useful because the Air Force will evaluate proposals based on whether they provide sufficient information to demonstrate an acceptable technical approach in terms of equipment, logistics processes, and workforce to successfully achieve production in accordance with the TDP. *See* AR Tab 74 at 2332 (Technical Approach evaluation criteria). Where one offeror has access to non-public government information that gives it unique insight in preparing its technical approach, there is an unequal access to information OCI. *See Ernst & Young, LLP*, 136 Fed. Cl. at 475 (finding an unequal access to information OCI where the awardee had access to non-public information that enabled it make accurate assumptions regarding staffing levels).

This type of information is well beyond information that would be acquired through mere incumbency. This record shows that Taber is directly involved in how the Government will evaluate and test the Next-Gen Pallets during performance of the production contract and the data underlying decisions about the performance characteristics to be incorporated into this RFP. The Air Force, however, denied offerors access to this Government-owned information – making it not only competitively useful but also nonpublic. AR Tab 53 at 1001-06; *see also* AR Tab 53

at 1006 (noting that the Government was not testing the re-designed pallet and was, therefore, relying on the test data from the UDRI/Taber contract).

GAO's decision also got it wrong. In denying this protest ground, GAO relied on a gross oversimplification, claiming that any nonpublic information shared with, or contributed by, Taber was nothing more than the "unique information, advantages, and capabilities due to its prior experience under a government contractor." *AAR Mobility, Sys.*, 2020 CPD ¶ 106 at *9. But GAO's decision suffers from the same flaw in the Air Force's OCI Review – GAO ignored the facts that Taber had unique access to nonpublic information that multiple offerors had described as competitively useful and that Taber likely had access to other competitively useful information that the Air Force never bothered to identify or evaluate.

*    *    *

In sum, because the Air Force's deficient investigation ignored the nonpublic information actually available to Taber and failed to inquire about the content of information shared with Taber during interactions with the Air Force and UDRI about this very same procurement, the Air Force's OCI review failed to comply with applicable law – it failed to "[i]dentify and evaluate potential [OCIs] as early in the acquisition process as possible" and failed to "[a]void, neutralize, or mitigate significant potential [OCIs]." FAR 9.504(a).

### 4. AAR Has Suffered Prejudice

"To prevail in a bid protest, the protester must show not only a significant error in the procurement process, but also that the error prejudiced it," *i.e.*, there is a greater than insignificant chance that a correction of the error would have yielded a different result. *See Am. Relocation Connections L.L.C. v. United States*, 789 Fed. Appx. 221, 228 (Fed. Cir. 2019). "[W]hen a potential significant OCI is identified, prejudice stemming from that OCI is presumed . . . ." *NetStar-1*, 101 Fed. Cl. at 529.

48

Here, AAR is prejudiced and has been deprived of a fair and equal basis on which to compete for award because the Air Force failed to conduct a rational OCI investigation in accordance with applicable law, it failed to reasonably identify and evaluate Taber's significant OCIs, and it failed to neutralize or mitigate those OCIs. Had the Air Force conducted a rational OCI investigation in accordance with FAR Subpart 9.5, it would have excluded Taber from the competition on the basis of immitigable OCIs. As a result, AAR would have the opportunity to fairly compete and would be in line for award under the RFP.

### C.     AAR Meets the Permanent Injunctive Relief Requirements

Although injunctive relief is an extraordinary remedy, it is appropriate relief where the plaintiff establishes that: (1) it has achieved success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) granting the injunction serves the public interest. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 575 (2004). "No one factor, taken individually, is necessarily dispositive." *C.W. Gov't Travel*, 61 Fed. Cl. at 559.

### 1.     AAR Will Suffer Irreparable Harm If Relief Is Not Granted

It is well established in this Court that, because AAR does not have an adequate remedy at law, AAR will suffer irreparable harm. This is a substantial ten-year manufacturing contract and AAR would be deprived of potential profits if an injunction is not issued and the Air Force is permitted to proceed with its plan to allow Taber to compete for this procurement. This Court has long recognized that a lost opportunity to compete for a contract, and the resulting lost profits expected from the contract – can constitute irreparable injury. *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 (2012); 28 U.S.C. § 1491(b)(2).

### 2. The Balance of Hardships Decidedly Favors AAR

The balance of the hardships favors AAR.  AAR's opportunity to fairly compete for this procurement outweighs any interest the Government could possibly have.  Conducting a proper procurement in accordance with the FAR is not a hardship.  *See Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 246 (2020).

### 3. Injunctive Relief Will Serve the Public Interest

Because the Air Force has failed to comply with applicable procurement laws, injunctive relief also serves the public interest.  "It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations."  *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 576 (2004).  Therefore, the issuance of an injunction here will serve the public interest by protecting the integrity of the procurement process.

## VI.    CONCLUSION

For the reasons set forth above, AAR respectfully requests that the Court grant this motion for judgment on the AR and permanently enjoin the Air Force from permitting Taber to compete for this procurement as either a prime contractor or subcontractor.

Dated:  May 18, 2020                                 Respectfully submitted,

                                                     /s/ Paul R. Hurst
                                                     Paul R. Hurst
                                                     STEPTOE & JOHNSON LLP
                                                     1330 Connecticut Avenue, N.W.
                                                     Washington, DC  20036-1795
                                                     Telephone: (202) 429-8089
                                                     Facsimile:  (202) 429-3902
                                                     E-mail:  phurst@steptoe.com
                                                     *Attorney of Record for AAR Mobility Systems*

*Of Counsel:*
Fred W. Geldon
Caitlin T. Conroy
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.

Washington, DC  20036-1795
Telephone: (202) 429-8198 (Geldon)
Telephone: (202) 429-8022 (Conroy)
Facsimile: (202) 429-3902
E-mail:  fgeldon@steptoe.com
E-mail:  cconroy@steptoe.com

# EXHIBIT 1

USASpending.gov | Data Lab
An official website of the U.S. government

**USA**SPENDING.gov

## Contract Summary

---

### Delivery Order (DO)

**PIID** GSQ0517BM0141
**Completed**

**Awarding Agency**

### General Services Administration (GSA)

**Recipient**

### UNIVERSITY OF DAYTON
300 COLLEGE PARK AVE ALBERT EMANUEL HALL
DAYTON, OH 45469-0001
Congressional District: OH-10
UNITED STATES

**Related Awards** ⓘ

Parent Award
GS05Q15BMD0001

0 Sub-Awards

**Dates** ⓘ

| | |
|---|---|
| Start Date | Jul 24, 2017 |
| Current End Date | Jan 23, 2020 |
| Potential End Date | Jan 23, 2020 |

**$ Award Amounts** ⓘ

**$3.2 M**
Obligated Amount

**$3.2 M**
Current Award Amount

**$3.2 M**
Potential Award Amount

```

| Obligated Amount | $3,173,492.00 |
|---|---|
| Current Amount | $3,173,492.00 |
| ○ Potential Amount | $3,173,492.00 |

View Transaction History

💬 Description

IGF::OT::IGF FOR OTHER FUNCTIONS TO 13 SE AND V AIRBORNE SYSTEMS ENGINEERING SUPPORT

North American Industry Classification System (NAICS) Code
54 : Professional, Scientific, and Technical Services
5413: Architectural, Engineering, and Related Services
541330: Engineering Services

Product or Service Code (PSC)
SERVICES
R: SUPPORT SVCS (PROF, ADMIN, MGMT)
R4: PROFESSIONAL SERVICES
R425: SUPPORT- PROFESSIONAL: ENGINEERING/TECHNICAL

📊 Contract Activity

**Coming Soon**
This feature is currently under development.

🍳 Federal Accounts

| Federal Account | Combined Obligated Amount | Percent of Total | Funding Agency |
|---|---|---|---|
| ACQUISITION SERVICES FUND, GENERAL S... | $3,173,492 | 100% | (DOD) DEPARTMENT OF DEFENSE |

NOTE: Result count may differ between treemap view and table view. Treemap view only displays accounts with a positive combined obligated amount, while table view displays all accounts.

Summary of All Federal Accounts used by this Award

| Total Funding Obligated | $3,173,492.00 |
|---|---|
| Total Count of Funding Agencies | 1 |
| Total Count of Awarding Agencies | 1 |
| Total Count of Federal Accounts | 1 |

| Total Count of Funding Agencies | 1 |
|---|---|
| Total Count of Awarding Agencies | 1 |
| Total Count of Federal Accounts | 1 |

⊞ View federal funding submissions

🕓 Award History                                                                                              ⓘ

| Transaction History  8  ⓘ | Sub-Awards  0  ⓘ | Federal Account Funding  1  ⓘ |
|---|---|---|

Transaction History ⌄

| Modification Number ⬍ | Action Date ⬍ | Amount ⬍ | Reason for Modification ⬍ | Description ⬍ |
|---|---|---|---|---|
| 0 | 07/24/2017 | $3,173,492 | -- | IGF::OT::IGF FOR OTHER FUNCTIONS TO 13 SE AND V AIRBORNE SYSTEMS ENGINEERING SUPPORT |
| PO001 | 03/28/2018 | $0 | M: OTHER ADMINISTRATIVE ACTION | IGF::OT::IGF FOR OTHER FUNCTIONS |
| PS002 | 04/09/2019 | $0 | C: FUNDING ONLY ACTION | IGF::OT::IGF FOR OTHER FUNCTIONS, SE&V AIRBORNE SYSTEMS ENGINEERING SUPPORT |
| PS003 | 05/30/2019 | $0 | B: SUPPLEMENTAL AGREEMENT FOR WORK WITHIN SCOPE | IGF::OT::IGF, FOR OTHER FUNCTIONS, SE&V AIRBORNE SYSTEMS ENGINEERING SUPPORT SERVICES |
| PS004 | 06/28/2019 | $0 | B: SUPPLEMENTAL AGREEMENT FOR WORK WITHIN SCOPE | IGF::OT::IGF, FOR OTHER FUNCTIONS, SE&V AIRBORNE SYSTEMS ENGINEERING SUPPORT SERVICES |
| PS005 | 10/09/2019 | $0 | B: SUPPLEMENTAL AGREEMENT FOR WORK WITHIN SCOPE | SE&V AIRBORNE SYSTEMS ENGINEERING SUPPORT SERVICES |
| PS006 | 01/07/2020 | $0 | B: SUPPLEMENTAL AGREEMENT FOR WORK WITHIN SCOPE | SE&V AIRBORNE SYSTEMS ENGINEERING SUPPORT SERVICES |
| PS007 | 03/04/2020 | $0 | B: SUPPLEMENTAL AGREEMENT FOR WORK WITHIN SCOPE | SE&V AIRBORNE SYSTEMS ENGINEERING SUPPORT SERVICES |

ℹ Additional Information

Expand All

🏛 Agency Details                                                                                              ›

Case 1:20-cv-00459-RAH   Document 24-1   Filed 05/18/20   Page 5 of 6

| | |
|---|---|
| ⛓ Parent Award Details | > |
| 📍 Place Of Performance | > |
| 📅 Period Of Performance | > |
| ✏️ Legislative Mandates | > |
| 🏢 Recipient Details | > |
| 🏷 Acquisition Details | > |
| 📊 Competition Details | > |
| ••• Additional Details | > |
| 👤 Executive Compensation | > |

✉ **Stay in touch with us!** Receive updates on USAspending.gov **Sign Up** ▸



ABOUT

About USAspending

HELP

FAQs

Community

Contact Us

RESOURCES

Data Model

Data Lab

Data Dictionary

DEVELOPERS

API

Explore the Code

Accessibility

Privacy Policy

Freedom of Information Act









© 2020 USAspending.gov

**NOTE:** You must click here for very important D&B information.