REDACTED VERSION

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

| | |
|---|---|
| AAR MANUFACTURING, INC. D/B/A AAR MOBILITY SYSTEMS, ) | |
| Plaintiff, ) | |
| v. ) | **Case No. 1:20-cv-00459-RAH** |
| ) | **Judge Richard A. Hertling** |
| UNITED STATES, ) | |
| Defendant, ) | **FILED UNDER SEAL** |
| TABER EXTRUSIONS, LLC. ) | |
| Intervenor. ) | |

**TABER'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND IN SUPPORT OF TABER'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Respectfully submitted,

Date: June 15, 2020

 /s/   *Anthony H. Anikeeff*
Anthony H. Anikeeff
Williams Mullen, PC
8300 Greensboro Drive
Suite 1100
Tysons, VA 22102
Tel: 703-760-5206
Fax: 703-748-0244
Email: aanikeeff@williamsmullen.com

*Attorney for Taber Extrusions, LLC*
*Of Counsel*

Shayn Allen Fernandez
Williams Mullen, PC
222 Central Park Avenue, Suite 1700
Virginia Beach, VA 23462-3035
(757) 629-0713 (phone)
(757) 473-0395 (facsimile)
Email: sfernandez@williamsmullen.com

**TABLE OF CONTENTS**

Page

I.   NATURE AND STATEMENT OF THE CASE ............................................................ 1

II.  ISSUES PRESENTED ............................................................................................... 2

III. COUNTER STATEMENT OF FACTS ..................................................................... 4

  A.  AAR Supplied And Maintained The Legacy Pallet ............................................. 4

  B.  UDRI Developed The Original Wide-Extrusion Concept For The Next-Gen All-Aluminum Cargo Pallet During An Air Force Feasibility Contract To Consider Alternatives To The Legacy Pallet ...................................................................... 4

  C.  The Aluminum Extrusion Process ...................................................................... 5

  D.  UDRI Developed, Matured, Qualified, and Delivered Prototype Pallets Under A Development Contract, With Extrusion And Manufacturing Development Input From Taber, Multiple Other Subcontractors and Others ....................................... 6

    1.  Taber's Role In UDRI's Development Contract Was To Work Toward Developing And Extruding Acceptable Components For Prototypes ...... 10

    2.  UDRI Worked And Consulted With Numerous Entities In Developing The Overall Next-Gen Air Cargo Pallet Design ............................................. 13

  E.  UDRI Delivered 500 Wide-Extrusion Pallets To The Air Force Through The Maturation and Low Rate of Initial Production Task Order Contract ................. 14

  F.  After Initially Soliciting Production Of The UDRI Wide-Extrusion Design, The Air Force Redesigned The Pallet To Solicit A Substantially Different Narrow-Width Extrusion Design In Which Taber /UDRI Were Not Involved .................. 16

    1.  Initial Air Force Pre-Solicitation Efforts Focused On the Wide Extrusion Design But Generated Concern ............................................................. 16

    2.  The Air Force Itself Redesigned the Next-Gen Pallet To A Narrow-Width Form To Resolve Industry's Concern About The Wide-Width Form, Without Involving UDRI or Taber ........................................................ 17

    3.  The Air Force Considered Potential OCI Issues Before AAR's Protest .. 20

  G.  The Air Force Thoroughly Investigated And Rejected AAR's OCI Concerns .... 20

  H.  The GAO Sustained The Air Force's OCI Determination .................................... 21

IV. ARGUMENT .......................................................................................................... 22

  A.  The Standard Of Review Is Deferential To The Air Force ................................... 22

  B.  AAR Cannot Establish A Biased Ground Rules OCI ........................................... 23

    1.  The Air Force's Narrow-Width Redesign Was Carried Out Without UDRI's Or Taber's Participation, Eliminating The Basis For AAR's Ground Rules Protest ................................................................................ 25

2.      Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Is Covered By The Development Contract Exception To the Biased Ground Rules OCI Prohibition.................................. 25

3.      Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Is Covered By The Multiple Contractor Exception To the Biased Ground Rules OCI Prohibition ...................................................... 28

C.      Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Cannot Succeed On Merits In Establishing Taber Had Access to Competitively Useful Nonpublic Information ....................................................... 30

D.      Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Cannot Succeed In Proving Taber Would Be Impaired In Performing The Contract .................................................................................... 34

E.      AAR Cannot Establish Irreparable Harm / Prejudice ............................................ 37

F.      Balance of Hardships Favors The United States..................................................... 38

G.      Public Interest Favors The United States................................................................ 38

V.      **CONCLUSION** ................................................................................................................ 38

## **TABLE OF AUTHORITIES**

**Cases**

*AAR Manufacturing Inc. d.b.a. AAR Mobility Systems*,
    B-418339, 2020 WL 418339 ............................................................................................ passim

*Aegis Technologies Group, Inc. v. United States*,
    128 Fed.Cl. 561(2016) ......................................................................................................... 24

*Alliant Techsystems, Inc.*,
    B-410036, 2014 WL 6065861 ............................................................................................... 34

*American Apparel, Inc. v. United States*,
    108 Fed.Cl. 11 at 21-22 (2012) ........................................................................................... 25

*American Artisan Productions, Inc.*,
    B- 292559, 2003 WL 22309118 ............................................................................................ 29

*ARINC Engineering Services, LLC v. United States*,
    77 Fed.Cl. 196 (2007) .......................................................................................................... 31

*Atlantic Aluminum & Metal Distributors, Inc. v. United States, 42 Cust.Ct.*,
    37 838-39, 1959 WL 8112 *2-*3 (1959) ................................................................................. 6

*Axiom Res. Mgmt., Inc. v. United States*,
    564 F.3d at 1381-82 .............................................................................................................. 22

*CACI, Inc.-Fed. v. United States*,
    719 F.2d 1567 (Fed. Cir, 1983) ............................................................................................ 31

*Computers Universal, Inc.*,
    B-292794, 2003 WL 22717841 ............................................................................................ 35

*Deva & Assocs., PC*,
    B-415508.11, 2019 WL 2903379 .......................................................................................... 35

*Ernst & Young, LLP v. United States*,
    136 Fed.Cl. 475 (2018) ......................................................................................................... 28

*Filtration Development Co., LLC v. United States*,
    60 Fed.Cl. 371 (2004) ..................................................................................................... 28, 31

*GIC Agric. Grp.*,
    B–249065, Oct. 21, 1992, 92–2 CPD ¶263 ........................................................................... 26

*Lakota Tech. Sols, Inc.*,
    B-298297, 2006 WL 2254601 ............................................................................................... 34

*Loch Harbour Grp., Inc. v. United States*,
    128 Fed.Cl. 294 (2016) ......................................................................................................... 23

*Lucent Technologies World Services, Inc.*,
    B- 295462, 2005 WL 525448 ................................................................................................ 28

*Macaulay-Brown, Inc. v. United States*,
  125 Fed.Cl. 591 (2016) ................................................................................. 23

*MAXIMUS Fed'l Servs.*,
  B-410359, 2014 WL 7649970 .......................................................................... 35

*Monterey Consultants, Inc. v. United States*,
  120 Fed.Cl. 567 (2015) ................................................................................. 22

*NetStar-1 Government Consulting, Inc. v. United States*,
  101 Fed.Cl. 511(2011) .................................................................................. 30

*North Carolina Division of Services for the Blind v. United States*,
  53 Fed.Cl. 147 n.13 (2002) ........................................................................... 23

*PAI Corp. v. United States*,
  614 F.3d at 1352 ..................................................................................... 22, 23

Parcel 49C Ltd. P'ship v. United States,
  130 Fed.Cl. 109 (2016) ................................................................................. 23

*Ressler Associates, Inc.*,
  B- 244110, 1991 WL 182394 ........................................................................... 28

*Sigmatech, Inc. v. United States*,
  141 Fed.Cl. 284 (2018) ............................................................................. 23, 35

*Snell Enter., Inc.*,
  2002 WL 1492090 *7 ..................................................................................... 28

*Systems Plus, Inc. v. United States*,
  69 Fed.Cl. 757 (2006) ............................................................................... 30, 31

*Turner Constr. Co. v. United States*,
  645 F.3d at 1386 ..................................................................................... 22, 23

*Vantage Associates, Inc. v. United States.*,
  59 Fed.Cl. 1, 11 (2003) ................................................................................. 28

*ViON Corp. v. United States*,
  122 Fed.Cl. 559 (2015) ................................................................................. 22

**Other Authorities**

Aluminum Extrusion Process Basics, Aluminum Extruders Council,
  https://www.aec.org/page/aluminum-extrusion-process-basics (accessed June 5, 2020) ........... 6

**Rules**

31 CFR § 35.201-18 .......................................................................................... 26
48 C.F.R. § 9.505 ........................................................................................... 34

**Regulations**

FAR § 1.7 ................................................................................................... 21
FAR § 2.101 ................................................................................................ 22

FAR § 35.001 ................................................................................ 26
FAR § 9.504(a) .............................................................................. 22
FAR § 9.505 .................................................................................. 22
FAR § 9.505(a) .............................................................................. 22
FAR § 9.505(b) .............................................................................. 22
FAR § 9.505-2 .......................................................................... 22, 28
FAR § 9.505-2 (b)(1)(iii) ............................................................... 29
FAR § 9.505–2(b)(1) ...................................................................... 27
FAR § 9.505–4 ............................................................................... 30
FAR § 9.508(c) .............................................................................. 27

## I.   NATURE AND STATEMENT OF THE CASE

The Air Force seeks to retain a production contractor for a newly designed all-aluminum air cargo pallet ("Next-Gen pallet") to replace the balsa and aluminum legacy air cargo pallet ("Legacy pallet") which dates to the 1960s (designated as 463L). Protestor, AAR Manufacturing Inc. *dba* AAR Mobility Systems ("AAR") has been the sole supplier for the Legacy pallet for decades. AAR seeks to preclude Intervenor, Taber Extrusions, LLC ("Taber"), from competing for the Next-Gen pallet production contract. It contends that Taber's involvement as a subcontractor to the University of Delaware Research Institute ("UDRI") on the development contract for the Next-Gen pallet created an organizational conflict of interest ("OCI") which affords Taber an unfair advantage in the current competition and would impair its objectivity in performing the contract were it to win the award.[1]   AAR's assertions are erroneous and should be rejected.

AAR's protest, at is core, is a red herring. AAR's only substantive complaint, in effect, is that Taber allegedly enjoys an advantage because it is one of a few U.S. companies which can extrude aluminum parts in a wide-width form. As AAR admitted in the its Government Accountability Office ("GAO") protest, however, the Next-Gen pallet <u>now</u> being procured was redesigned internally by the Air Force to a narrow-width form during the current solicitation process specifically to resolve that industry concern. The design no longer presents an extrusion issue for the industry or AAR. As AAR further admitted, multiple entities can extrude narrow-width components and therefore effectively stand on equal footing with Taber. Accordingly, AAR

---

[1] AAR abandoned its challenges the solicitation's past performance criteria and its best value process at the GAO.

1

cannot establish any prejudice or injury, balance of hardship in its favor, public interest, or likelihood of success on the merits arising from an OCI on this production contract solicitation.

Although the Air Force's redesign should obviate the need to address AAR's arguments, they are unavailing and based upon an irreconcilable conflict. On the one hand, AAR contends that Taber should be excluded because it was deeply involved in designing the Next-Gen pallet. On the other hand, in also asserting that there was no design and development contract, AAR contends that there was no need for design and development because the project was just a form, fit, and function adjustment to the Legacy pallet. AAR cannot have it both ways. The Administrative Record establishes that Taber, as a subcontractor, properly provided aluminum extrusion expertise to UDRI under UDRI's development and design contract to develop, qualify, and deliver prototype Next-Gen pallets to the Air Force. Neither UDRI nor Taber believe Taber contributed to the Air Force's technical design package or the specifications for the original wide-width design. However, even assuming that Taber did so inadvertently to some minimal degree, the GAO correctly opined that the Air Force's OCI timely investigation correctly concluded there existed no impermissible OCI for which Taber must be excluded. Moreover, whatever occurred regarding the wide-width design is irrelevant to the narrow-width design as to which Taber played no part whatsoever. Accordingly, the Court should deny AAR's motion, grant Taber's motion, and dismiss AAR's protest.

## II.    ISSUES PRESENTED

First, whether Taber must be barred from competing for the production contract based upon alleged biased ground rules, unequal access, and impaired objectivity OCIs, where the Air Force (i) internally designed a new narrow-width panel during the current solicitation which resolved

AAR's and industry's concerns about UDRI's prior wide-width design and (ii) neither Taber nor UDRI were involved in the Air force redesign effort.

Second, assuming the matter is not resolved in favor of the United States under the first issue, whether the Air Force and the GAO correctly determined Taber need not be barred from competing for the production contract based upon an alleged biased ground rules OCI where Taber participated in UDRI's development contract by furnishing extrusion and materials advice and extrusion services, prior to the Air Force redesigning the pallet.

Third, assuming the matter is not resolved in favor of the United States under the first issue, whether the Air Force and the GAO correctly determined Taber need not be barred from competing for the production contract based upon an alleged biased ground rules OCI where Taber was but one of several entities which provided advice and services to UDRI under the development contract, along with others with whom UDRI consulted independently, regarding the manufacture of the overall Next-Gen pallet, prior to the Air Force redesigning the pallet.

Fourth, assuming the matter is not resolved in favor of the United States under the first issue, whether the Air Force and the GAO correctly determined Taber need not be barred from competing for the production contract based upon an alleged OCI resulting from its alleged unequal access to proprietary information or source selection information relevant to the contract which is unavailable to all competitors.

Fifth, assuming the matter is not resolved in favor of the United States under the first issue, whether the Air Force and the GAO correctly determined Taber need not be barred from competing for the production contract based upon an alleged its potential impaired objectivity in performing the contract based upon its involvement in UDRI's development contract, prior to the Air Force redesigning the pallet.

III.    **COUNTER STATEMENT OF FACTS**

   A.    **AAR Supplied And Maintained The Legacy Pallet**

   The Air Force developed and has used the Legacy pallet (referred to as the 463L pallet) since the 1960s to transport air cargo. It is the primary cargo pallet used by the Department of Defense for air transport. (Administrative Record Tabs ("AR Tab(s)") 40 at 647; 100 at 2498). The Legacy pallet utilizes a balsawood core and an extruded aluminum skin. (AR Tab 100 at 2498) AAR, ███████████████████████████████████████████████████████████ ████████████████████████, (AR Tab 29 at 399-400) has been the sole supplier and maintenance provider for the Legacy pallet for decades. (AR Tabs 29 at 394; 43 at 720) The Legacy pallet has a service life of less than five years and maintenance is an expensive issue. (AR Tabs 100 at 2498; 126 at 3185)

   B.    **UDRI Developed The Original Wide-Extrusion Concept For The Next-Gen All-Aluminum Cargo Pallet During An Air Force Feasibility Contract To Consider Alternatives To The Legacy Pallet**

   During 2012, the Air Force contracted with UDRI to conduct a feasibility study regarding alternate suppliers, materials, and designs for the Legacy pallet. (AR Tab 104 at 2651) The Air Force hoped to develop and prove out a new technology pallet design capable of meeting the military's requirements, being manufactured in mass quantities, and being competitively competed. (See AR Tab 75, Att. 5 at 2418 (Hernandez Decl. ¶ 2))

   UDRI considered various alternatives including new designs, different core materials, and different processes. It settled on an extruded aluminum core design like the extruded aluminum military airfield runway matting of which is was aware. (See AR Tab 104 at 2652) Already familiar with extrusion of aluminum, UDRI developed the Next-Gen all-aluminum design concept which showed promise in terms of cost and performance. (AR Tabs 100 at 2498; 104 at 2651) It involved

using an "all-aluminum pallet constructed using large closed cell extrusion profiles that are joined by friction stir welding." (AR Tab 106 at 2803)  UDRI concluded its feasibility study by submitting a white paper to the Air Force.  (See AR Tabs 75 Att. 1 at 2408  (Bowman Decl. ¶ 2) and Att. 10 at 2429 (Pallini Decl. ¶ 3); 100 at 2498 (refencing Bowman, *et al*, "HCU-6/E Air Cargo Pallet Feasibility Study and Design of the Next Gen Pallet," UDR-TR-2014-14, January 2014)). UDRI's feasibility study demonstrated that a manufacturing process that utilizes large unitized extrusions that are friction stir welded together could be used to manufacture a pallet that met all technical requirements, reduced initial acquisition cost, and cut life-cycle-cost substantially by doubling the service life. (AR Tab 100 at 2498). The contract concluded in September 2014 (AR Tab 104 at 2651)

UDRI reached out to Taber as an industry representative during its feasibility study.[2] Founded in 1973,Taber is a well-established aluminum extrusion company.  It has produced an array of extruded products for the U.S. Government and industry. (See AR Tab 109 at 2896-97)

## C.    The Aluminum Extrusion Process

Aluminum extrusion is the process by which a billet (essentially a log) of aluminum is softened by heating and is then pressed through a shaped die with a hydraulic press. This creates a fully formed piece of aluminum in the intended shape as it is squeezed through the die. (AR Tab 22 at 258 (Taber process); see also AR Tab 2 at 18 n.1)) As explained on the public website of the Aluminum Extruders Council: "The extrusion process is similar to [a] PlayDoh® press in that the

---

[2] UDRI contacted Taber during this period to ███████████████ and to gain knowledge about the ███████ ███████████. (AR Tabs 75 Att. 13 at 2445 (██████ Decl. ¶ 4); Att. 14 at 2451 ███r Decl. ¶ 6); Att. 1 at 2409 (██████ Decl. ¶ 7)) Taber also responded to UDRI inquiries about ███████ and ███████████████. (AR Tab 75 Att. 13 at 2445 (██████ Decl. ¶ 4); Att. 14 at 2451 (██████ Decl. ¶ 7)). It proposed no designs or specifications, had no contact with the Air Force, and did receive any private competitively useful information from the Air Force. (AR Tab 75 Att. 13 at 2445-46 (██████ Decl. ¶ 4); Att. 14 at 2450-51 ███████ Decl. ¶ 4)).

malleable dough is forced through the press and flows through the opening fitted with a particular die shape . . . [T]he actual aluminum extrusion process is more complicated than this. However, with the aid of a powerful hydraulic press producing an incredible variety of useful products with almost any shape imaginable is possible with aluminum extrusion." (See Aluminum Extrusion Process Basics, Aluminum Extruders Council, https://www.aec.org/page/aluminum-extrusion-process-basics (accessed June 5, 2020); *Atlantic Aluminum & Metal Distributors, Inc. v. United States, 42 Cust.Ct.*, 37 838-39, 1959 WL 8112 *2-*3 (1959) (describing extrusion process).

> ### D. UDRI Developed, Matured, Qualified, and Delivered Prototype Pallets Under A Development Contract, With Extrusion And Manufacturing Development Input From Taber, Multiple Other Subcontractors and Others

In August 2014, based upon UDRI's work under the feasibility contract, (AR Tab 100 at 2498) the Air Force awarded UDRI Contract No. FA8519-14-C-0004 as a Rapid Innovation Fund ("RIF") effort, to develop, manufacture, conduct qualification testing, and deliver prototypes of an all-aluminum Next-Gen pallet. (AR Tab 100 at 2476-2551)[3]. The Air Force funded the contract with Research and Development funds (See AR Tab 75 at 2401 (citing AR Tab 100 and Sept. 2019 Treasury FAST Book)) The contract ran until August 2016 with the objective being for UDRI to manufacture and qualify a Next-Gen extruded all-aluminum FSW cargo pallet and to deliver all necessary engineering technical data along with a government-owned procurement data package, by managing the engineering, fabrication, test and evaluation, and transition work, (AR Tabs 100 at 2498-2499; 104 at 2651 ("prototype, qualify, document, and prepare design for procurement and production")) UDRI explained in its Final Report to the Air Force that it, "performed design, development, qualification testing, and delivery of prototype Next-Gen cargo pallets." (AR Tab

---

[3] The executed contract is located at AR Tab 124, but lacks the amendments to the contract. Accordingly, we refer to the collected contract documents at AR Tab 100.

106 at 2803) UDRI's Principal Investigator, System and Sustainment Engineering Group Leader, ███████████, considered it to be a development and maturation contract, "due to the substantial amount of technology, materials, processes, and methods that were developed in our effort to update the design and the legacy early 1960's specifications for the cargo pallets." (AR Tabs 75 Att. 1 at 2408 ███████ Decl. ¶ 4); 62 at 1049 (noting the contract had "developed and tested a pallet prototype ….")). In its GAO protest, AAR referred some 50 times to the contract as a development contract, (see AR Tab 72 at 1651-71) and referred to it as an RFP Development contract in its briefing.

The contract directed UDRI to: (1) select and subcontract with an aluminum extrusion company to fabricate the extrusion dies and extrude the Next-Gen pallet subcomponents; (AR Tab 100 at 2499) (2) select and subcontract with an automated welding/manufacturing company for the Next-Gen pallet FSW and pallet fabrication; (AR Tab 100 at 2499) (3) work with these subcontractors to develop and define the requirements and produce a minimum of six Next-Gen pallets for Test & Evaluation/Qualification efforts; (AR Tab 100 at 2499)[4] (4) update and revise the military standard specification, MIL-DTL-27443F, to reflect the new design; (AR Tab 100 at 2499, 2501) (5) create a Technical Data Package ("TDP") to depict the final product; (AR Tab 100 at 2500) (6) revise the Technical Order package (*i.e.*, Manual) for the Next-Gen pallet; (AR Tab 100 at 2501) (7) redesign as necessary to correct discovered errors; (AR Tab 100 at 2499) and, (8)

---

[4] The Air Force amended the contract to purchase eight additional pallets for testing and delivery. (AR Tab 100 at 2540 (amend 0003) The Air Force also directed UDRI to explore three alternate extrusion approaches to reduce risk. (AR Tab 100 at 2540, 2550 (Plans A - Double Stacked dies, B-Baseline Die Modification, and C-Lightening hole activities))

conduct risk mitigation activities. (AR T 100 at 75)[5] It required far more than mere systems engineering (*i.e.,* SETA) work.

UDRI's design consisted of a total of six extruded aluminum pieces which were to be machined and welded together. The extruded pieces included two middle panels and two edge panels each to measure about ██████ in width, totaling about ██████. There also were to be extruded two end panels. (See AR Tab 104 at 2653-2655) (images)). The panels were extruded in the form of adjacent cell blocks. (See AR Tabs 104 at 2654; 106 at 2806 (images of cell structure)) Once the panels were extruded, they were to be joined by welding and machining. (AR Tab 106 at 2808) In addition, hoisting rings were to be fabricated and attached to the pallets (AR Tab 106 at 2814 (image))

UDRI subcontracted with Taber to extrude the ███ unique profiles used in its design.[6] When Taber encountered initial manufacturing issues with the middle and edge panels, UDRI undertook risk mitigation efforts by having Taber extrude several alternative designs using ██████ and ██████████. (AR Tabs 104 at 2657; 106 at 2805) In its risk mitigation efforts, UDRI had two companies manufacture pallets from Taber's extrusions (See AR Tab 106 at 2808-11) UDRI contracted with ██████████████████████") to weld, machine, and assemble some of the Taber-extruded parts. (AR Tab 106 at 2808-09) UDRI also had Taber subcontract welding, machining, and assembly of additional pallets to ████████████. (AR Tab 106 at 2810-12) Taber ultimately succeeded in manufacturing the original baseline design extrusions using pallets

---

[5] The contract referred to the Next-Gen pallet as being "form, fit and function" only in the context that its "geometry" would be the same as that of the Legacy pallet. (AR Tab 100 at 2498)

[6] Taber considered UDRI's requirements to be ██████████ and pushing Taber's ████████████████. (AR Tab 75, Att. 14 at 2452 (████████ decl. ¶ 9))

████████████████████████████████████████████████████
████████████████████████████████████████████

manufactured by ███ and ████████. (AR Tab 106 at 2805)[7] UDRI also engaged with ███ ███e and other entities to address design and other issues with the tie down rings. (AR Tab 106 at 2812-15) UDRI subsequently conducted qualification and first article testing. (AR Tab 106 at 2816-2819). UDRI also rewrote the Specification – MIL-DTL-27443, recommended changes to the Manual, and developed a complete Technical Data Package. (AR Tab 16 at 2820-22)

By the end of the contract, according to the Air Force, UDRI had "designed and delivered ███ test pallets". (AR Tab 25 at 267). UDRI also transmitted several required deliverables, including: (1) Detailed Specification (AR Tab 102); (2) Technical Manual (AR Tab 101); (3) Technical Data Package including drawings, models and lists (AR Tab 103); (3) Presentation Material (DI-ADMN-81373/T) on FA8519-14-C-0004, 463L Pallet All Aluminum. (AR Tab 104); (4) Qualification Test Report (AR Tab 105); and (5) UDRI's Final Report. (AR Tab 106). In its Final Report, UDRI explained that, "Under this program, UDRI performed design, development,

---

[7] UDRI's monthly reports reflect that UDRI worked with ██████████████ and their subcontractors from late 2014 until mid-2016 to address extrusion and manufacturing (welding and machining) challenges with UDRI's pallet design and design and other issues with the tie-down rings. (See, e.g., AR Tab 130, Data Submissions, Monthly Report No. 1 ("Mo. Rep.") at 3373-74 (updated quotes from Taber and ███); Mo. Rep. 2 at 3530 (contracts with Taber (████████████████████) and ███ (██████████████████████ expected in October); Mo. Rep. 5 at 4301 (working with ████████████████████); Mo. Reps. 6 at 3366 & 7 at 3388 (UDRI considering redesign of ████████████████████████████); Mo. Rep. 8 at 3396-99 (Taber has extruded each type of ██████ but ████████████████████████, to address multiple ████████; ██ ████ continues); Mo. Rep. 9 at 3407-3408 (UDRI working through ██████ and ████████); Mo. Rep. 10 at 3419 (As alternative extrusion effort, Taber received a ████████ based upon its work on ████ where ████████; ██████████████); Mo. Rep. 11 at 3429-30 (████████████████); Mo. Reps. 12 at 4335, 4337 and 13 at 3436-40 (UDRI working with ██████████ ████████████; ██ continues); Mo. Rep. 14 at 3379-80 (UDRI approves ████████████████ per its successful ████████; ████████████; ███ ████); Mo. Rep 16 at 3452-53 (Taber working multiple ████████████; ████████ issue resolved with ████████); Mo. Rep. 17 at 3462 (Taber directed to locate ████████ as ████████████); Mo. Rep. 18 at 3471-3474 (████████; Taber working with ████); Mo. Rep No. at 3482 (Taber ████████ for ████ while also producing ████; ██ continuing efforts); Mo. Rep. 22 (Taber extruded ████ of ████████████; Taber delivered ████████; ██ and delivered to Air Force; ████████████████); Mo. Rep 23 at 3511 (projecting UDRI will prepare for Final Program Review on July 14, 2016)).

qualification testing, and delivery of protype Next-Gen cargo pallets. . . . Significant challenges in manufacturing were overcome, and modifications were made to the pallet design to enable it to pass qualification testing." (AR Tab 106 at 2823)

1.      **Taber's Role In UDRI's Development Contract Was To Work Toward Developing And Extruding Acceptable Components For Prototypes**

Taber worked closely with UDRI and fellow subcontractors ████ and ████████ for months to develop the Next-Gen pallet prototype. Taber and UDRI agree, however, that Taber did not contribute materially to the specifications or technical data package UDRI submitted to the Air Force. (AR Tab 75 Att. 1 at 2408-09 (████████ Decl. ¶¶ 6 & 7); Att. 13 at 2446-47 (████████ Decl. ¶ 5); Att. 14 at 2452-53 ████ Decl. ¶ 10)) In its proposal to the Air Force, UDRI explained that "In this program Taber will utilize the ████████████████████████████████ ████████████████████████████████ …." (AR Tab 109 at 2886)

UDRI's ████████, as a Group Leader, reviewed the technical data package and specifications developed during the contract.  He concluded he could not, "identify any materials that were prepared by Taber which were subsequently incorporated into the data that UDRI delivered to the USAF that the USAF would have used in their solicitation or the technical data package they created from UDRI's data." (AR Tab 75 Att. 1 at 2408-09 (████ Decl. ¶ 6))  He "estimate[d that] . . . the percentage of the Air Force Next-Cargo Pallet technical data package and specification that UDRI delivered to the USAF that Taber contributed to was 1%." (Id., at 2409 ¶ 6)

████ observed that, "Taber was not directly and extensively involved in the development of the specifications underlying this procurement[]" (id.), explaining: "My interactions with Taber relevant to my preparing the technical data package for the Next-Gen

Cargo Pallet included ██████████████████ and ███████████████. In the
beginning of the project I engaged with Taber to learn the ███████████████
██████. The final drawing package UDRI delivered to the USAF reflected these industry
capabilities. UDRI made all technical decisions relevant to the design and final specification." (Id.,
at 2409 ¶ 7)  Taber concurred that it was not involved in developing specifications or the technical
data package that went to the Air Force. (AR Tab 75 Att. 13 at 2446-47 (██████ Decl. ¶ 5); Att.
14 at 2452-53 (██████ Decl. ¶ 10))

        ██████'s observations are consiste1nt with those of Taber.  Taber's practice, when it
received drawings from UDRI, was to ████████████████████████████
██████ for internal use. It reviewed the UDRI design to determine if it was ████████████
████████████████████████. (AR Tab 75 Att. 14 at 2450
(Locher Decl. ¶ 4)). Taber's engineers ████████████████████████████
██████ which were then ██████████████████████████.  (Id.)
Taber's focus as an extrusion fabrication company is solely to bring its considerable ██████
████████████████████████████, ████████████████
████████████████████. Taber does not view it as its role to ████████████
████████████████████, but to advise how Taber might be able to ██████████████
██████████. It is up to the customer to decide how it desires to proceed.  The process may involve
████████████████████. If hired for a project, the ████████████████
██████████████ from which ████████████████████████
██████████. Once the component extrusions are complete, if further work is required to
manufacture a product, such as machining or welding, Taber ████████████████
████████████████. (Id. at 2450-51 ¶ 4)

Taber, UDRI, and the Air Force agree that Taber had virtually no contact with the Air Force during this contract and was not furnished any private, competitively useful information, directly or indirectly through UDRI, about the pallets from the Air Force. (AR Tab 75 Att. 13 at 2446 ████ Decl. ¶ 5) (noting one meeting at ████ with Air Force); Att.14 at 2450 ████ Decl. ¶ 10))  Indeed, UDRI undertook precautions to ensure that neither Taber nor others involved were exposed to any such information.  As Mr. ████ explained:

> During the course of the Next-Gen development contract I understood that the goal of the contract was to deliver to the Air Force all necessary technical data along with a government owned procurement data package, to support a follow on production contract. Therefore, I took precautions to avoid release of competitively useful nonpublic information to UDRI's subcontractors or other vendors, so that they might compete in the follow on production contract. Namely, I limited the direct contact of the UDRI's subcontractors with the Air Force.

(AR Tab 75 Att. 1 at 2408 (████ Decl. ¶ 4))  As a result, Mr. ████ was certain that Taber did not receive any nonpublic information from the Air Force.  As he stated:

> While there were various meetings with UDRI, its subcontractors, and the Air Force I am not aware of any competitively useful nonpublic information released from the Air Force to the subcontractors during these meetings. Accordingly, I am not aware of any nonpublic information, including source selection information, contractor bid or proposal information, or other proprietary, confidential, or source-selection-sensitive material, which could result in a competitive advantage to Taber or any of the other UDRI subcontractors in the follow-on Cargo Pallet production contract that was released from the Air Force.

(Id., at 2408 ¶ 4) The testimony of Mr. ████ at UDRI and Mr. ████ and Ms. ████ at Taber were confirmed by numerous Air Force personnel. (AR Tab 75 at 2404 (contracting officer ████); id., Att. 2 at 2412 (primary engineer ████ Decl. ¶ 4); Att. 3 at 2414 (test engineer ████ Decl. ¶ 4); Att. 4 at 2416 (equipment specialist / supervisor ████ Decl. ¶¶ 2,4) (attended UDRI meetings); Att. 5 at 2418 (engineer of record ████ Decl. ¶ 4) (worked closely with UDRI); Att. 6 at 2420 (project engineer ████ Decl. ¶¶ 2-3) (worked closely with

UDRI); Att. 7 at 2423 (test engineer ▇▇▇ Decl. ¶ 4); Att. 8 at 2425 (equipment specialist ▇▇▇

Decl. ¶ 4); Att. 9 at 2427 (office of chief engineer ▇▇▇ Decl. ¶ 4) (attended UDRI meetings);

Att. 10 at 2429 (contracting officer ▇▇▇ Decl. ¶ 4); Att. 11 at 2431 (logistics manager ▇▇▇

Decl. ¶¶ 2,4) (meetings with UDRI team – emphasized no information from Air Force); Att. 12 at

2443 (equipment specialist ▇▇▇ Decl. ¶¶ 2, 4) (toured Taber))

### 2. UDRI Worked And Consulted With Numerous Entities In Developing The Overall Next-Gen Air Cargo Pallett Design

UDRI worked and consulted with numerous entities besides Taber as it developed and

refined its design and produced prototypes.  As explained by Mr. Bowman:

> To the extent that Taber assisted in manufacturing prototype extrusions and
> contracting with other vendors for fabrication of prototype, demonstration, and
> Operational Test and Evaluation Next-Gen cargo pallets, and UDRI's design
> evolution logically followed from and during that activity, other vendors also
> participated in prototyping, fabrication, welding, forging and other activities, but
> did not drive any design or specification decisions. Those other vendors included:
> ▇▇▇▇▇▇▇▇▇▇, which is not only a friction stir
> weld machine manufacturer, but also a friction stir weld provider, who also
> fabricated whole pallets that UDRI then completed with tie down rings; ▇▇
> ▇▇▇▇▇▇ who friction stir welded pallets in the RIF program; ▇▇
> ▇▇▇ who performed machining services for ▇▇ pallets; and
> ▇▇▇▇ who performed machining services for Taber pallets. UDRI
> consulted with some of these companies at various times on the UDRI RIF contract.
> Another vendor used during the program was ▇▇▇▇▇, a tie down ring
> manufacturer, and ▇▇▇▇▇, their subcontractor. I consulted with them
> during the course of the UDRI RIF contract and the Air Force's Next-Gen Cargo
> Pallet includes an updated tie down ring that UDRI developed and ▇▇▇
> prototyped. The Air Force's Next-Gen Cargo Pallet follow on production contracts
> will require extrusions, friction stir welding, machining, and tie down ring
> fabrications.

(AR Tab 75 Att. 2409 ▇▇▇ Decl. ¶ 8)) Mr. ▇▇▇ also explained:

> I consulted with, reviewed capabilities of, and/or interacted with a variety of
> technology, manufacturing, and service companies during my development of the
> Next-Gen pallet including, but not limited to the following list. My final design was
> a synthesis of all information I was able to obtain along with UDRI's internal
> analysis, design, development, and testing activities.

13

Extruders: ███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████

Friction Stir Welders (FSW) and FSW Equipment Suppliers: ████████
████████████████████████████████

Machine Shops: ███████████████████████████

Tie-Down Ring Suppliers: ██████████████████████
███████████████

Cargo Pallet Vendors: ███████████████████████████
████████████████

(AR Tab 75 Att. 1 at 2409-10 ██████ Decl. ¶ 9))

### E.  UDRI Delivered 500 Wide-Extrusion Pallets To The Air Force Through The Maturation and Low Rate of Initial Production Task Order Contract

During May 2017, the Air Force awarded UDRI Support Equipment & Vehicles Airborne Systems, Engineering Support, IDIQ GSA ITSS ID05140071, Task Order 13, to conduct manufacturing maturation of the prototype Next-Gen pallets and to deliver up to 500 additional pallets for testing and study. (AR Tab 76) The Air Force's contracting officer and its Engineer of Record both considered it to be a low-rate-initial-production ("LRIP") contract. (AR Tab 75 at 2404, 2418) The Air Force required UDRI to develop mitigation strategies to address manufacturing challenges, conduct manufacturing process-improvement and maturation activities, and prove those with trials resulting in components for ground, laboratory, and flight testing as well as field trials regarding the NextGen pallets.  (Id., at 2457) In doing so, UDRI was directed to focus upon improving the tie-down ring design, pallet manufacturing maturation and testing, engineering support and updating the specifications and technical order for quality and inspection

14

checks. (Id.)  UDRI also was directed to assess all areas of manufacturing process improvement to reduce downstream risk for procurement and enterprise-wide implementation of the Next-Gen pallet. UDRI's efforts were to include manufacturing process planning, development, and execution with trial manufacturing runs up to a maximum of 500 total Next-Gen cargo pallets. The expectation was that manufacturing process trials would be used to produce finished pallets which would be delivered for laboratory, ground, and flight-testing validation and verification activities with the Air Force. (Id.)

The LRIP contract ran until January 2020. (See AR Tab 77)  As of December 2019, UDRI reported that it had completed all testing and had manufactured and delivered the 500 pallets by May 2019. (AR Tab 77 at 2465-66)

Taber subcontracted to undertake process improvement and cost reduction efforts which it was to demonstrate through trial production runs for the 500 pallets. (AR Tab 75, Att. at 13 (Noecker Decl. ¶ 6); Att. 14 at 2453 (Locher Decl. ¶ 11)) Taber was not requested, nor did it furnish any designs or specifications to UDRI during this contract. (Id.)  Taber worked from the designs furnished by UDRI. Notably, when Taber ██████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████████████."
(Id. at 2453 ¶ 11). Although Taber engaged in several meetings with the Air Force during this contract, no one at Taber was furnished any private competitively useful information from the Air Force, directly or through UDRI. (AR Tab 13 at 2447-78  (██████ Decl. ¶ 6); Att. 14 at 2453 (██████ Decl. ¶ 12); accord Att. 5 at 2418 (██████ Decl. ¶¶ 2,4); Att. 6 at 2420  (██████ Decl. ¶¶ 2,4); Att. 11 at 2431 ██████ Decl. ¶¶ 2,4) (emphasizing in Taber meeting that no Air Force information could be shared); AR Tab 75 at 2404 (contracting officer ██████))

**F.     After Initially Soliciting Production Of The UDRI Wide-Extrusion Design, The Air Force Redesigned The Pallet To Solicit A Substantially Different Narrow-Width Extrusion Design In Which Taber /UDRI Were Not Involved**

**1.     Initial Air Force Pre-Solicitation Efforts Focused On the Wide Extrusion Design But Generated Concern**

In response to the Air Force's August 2017 Request for Information and Capabilities, (AR Tab 25 at 291) and the Air Force's November 2017 Sources Sought Notice, (AR Tab 26) multiple companies expressed interest in the Next-Gen project. The Air Force's Market Research indicated multiple companies might be capable of manufacturing the Next-Gen pallet. (AR Tab 39 at 584-588).[8] In its November 2018 Acquisition Strategy, the Air Force rated the Next-Gen effort to be low-risk because it was no longer in the "design phase," had passed all structural and environmental testing, and would be a build-to-print effort from the Air Force owned military standard drawings. (AR Tabs 39 at 617; 43 at 727)

On about November 21, 2017 the Air Force published a sources-sought notice, which included drawings in substantially the same form as received from UDRI in August 2016. (AR Tabs 73 at 1; 75 Att. 6 at 2420 (██████ Decl. ¶ 5)). They included the four-panel wide-extrusion design reflecting a panel extrusion width of about ██████ inches for the middle and edge panels. (AR Tab 75 Att. 6 at 2420 ██████ Decl. ¶ 5)) Shortly after issuing this notice, a supplier raised a concern to the Air Force about the width of the extrusion and suggested that a 6-panel design with a maximum width of about ██████ inches would be more commercially practicable. (AR Tab 75 Att. 6 at 2420 ██████ Decl. ¶ 5))

The Air Force continued to pursue the wide-extrusion design and conducted market analysis of potential suppliers. (AR Tab 41). The report concluded that multiple companies

---

[8] An Air Force 2018 Market Research Report indicated that several companies ████████████████████, possessed the capability to undertake the Next-Gen effort, (AR Tab 41 at 683-690, 692)

16

possessed capabilities and experience to produce the pallet solicited. The report cautioned, however, that the full production of the all-aluminum pallet required a high level of technical ability for the extrusion and the FSW operations. In order to continue to meet the Air Force's high demand, the report recommended that full and open competition be pursued. (Id., at 692)

> **2.    The Air Force Itself Redesigned the Next-Gen Pallet To A Narrow-Width Form To Resolve Industry's Concern About The Wide-Width Form, Without Involving UDRI or Taber**

The Air Force Project Engineer for the Next-Gen project, ███████████, continued to discuss the extrusion width issue with extrusion sources into the fall of 2018, with some saying that they could provide that width of extrusion and some saying that they could not. (AR Tab 75 Att. 6 at 2420 (████ Decl. ¶ 6))   During 2018, however, based upon industry concerns about the wide-extrusion design, ████ and another Air Force engineer began to develop internally a narrow-extrusion design based on 6 panels with a maximum width of ████ inches. (AR Tab 75 Att. 6 at 2420 ████ Decl. ¶ 6).

In late January 2019, the Air Force posted a presolicitation notice for the Next-Gen Pallet (See AR Tab 75 Att. 6 at 2420-21 ████ Decl. ¶ 7))  Before the technical data package could be posted, a potential offeror expressed concern with the wide-width design. The contracting officer inquired of ████ if production using the 4-panel design was commercially practicable. Horn explained that some sources had the capability to produce the design but that he was not certain if more than one vendor would be able to supply the necessary aluminum extrusions. (AR Tab 75 Att. 6 at 2420-21 (████ Decl. ¶ 7))

By about February 15, 2019, Mr. ████ had developed a relatively complete version of the 6-panel narrow-width design.  (AR Tab 75 Att. 6 at  2421 ████ Decl. ¶ 8)

On February 22, 2019, the Air Force posted a technical data package for the Next Gen Pallet, which still contained the 4-panel design. (See AR Tabs 75 Att. 6 at 2421 ███ Decl. ¶ 9); 46 (drawing package))

On March 27, 2019 the Air Force hosted a presolicitation conference. (AR Tab 51 at 977; See AR Tab 53 at 982-1017) The Air Force addressed various issues with the proposed contract and afforded participants the opportunity to ask questions and to conduct one-on-one meetings with the Air Force. (See AR Tab 53 at 1000-13 (questions), 1015-17 (one-on-one meetings)) Several vendors expressed concern with the wide-width extrusion design and requested the Air Force to consider a narrow-width extrusion design. (AR Tab 53 at 1000, 01, 03, 07,10, 17)  They contended that there were only a limited number of aluminum extruders which could produce the wide ███ inch aluminum extrusions. (*Id.*; see also AR Tab 75 Att. 6 at 2421 (███ Decl. ¶ 10)) Among them was AAR which pressed its singular concern that there was but one company which could extrude the wide-width design and requested that the Air Force provide a revised narrow-width design profile "to lower program costs, [and ] increase competition . . . " (AR Tab 53 at 1003, 1017) (emphasis added)

During the internal Air Force meeting following the conference, the agency requested ███ to proceed with the narrow-width extrusion panel design. (AR Tab 75, Att. 6 at 2421 ███ Decl. ¶ 10)  Accordingly, the Air Force advised in subsequent responses to further industry questions that it would be issuing a revised design reflected in new drawings. (AR Tab 53 at 1000, 02, 03, 05, 07, 09, 10). To emphasize that there was a substantially new design, the Air Force also explained that its different design was why it would not distribute UDRI's Final Report from the development contract, lest it be misleading. (AR Tab 53 at 1005)

From then on, the solicitation proceeded based upon the Air Force's new pallet design. On April 24, 2019, the Air Force posted the revised technical data package to include the new preliminary 6-panel design. (AR Tab 75 Att. 6 at 2421 (████ Decl. ¶ 11)) On May 16, 2019, the Air Force posted a revised technical data package to include the 6-panel design in three-dimensional electronic files. (AR Tab 75, Att. 6 at 2421 (████ Decl.¶ 12) (citing AR Tab 73, Pre-solicitation Notice)

On August 19, 2019, the Air Force issued the Request for Proposals for the Next-Gen pallet. (See AR Tab 65 at 1171 and following) On October 1, 2019, the Air Force amended the solicitation to include the final technical drawing package which included the Air Force's six-panel redesign. (AR Tabs 75, Att. 6 at 2421 (████Decl. ¶ 13); 65 at 1304 (amend 0002), 1315-17 (drawings); 1334-58 (revised Specification, 1359-69 (publication Notice)). The Air Force updated the detailed specification on October 30, 2019 (AR Tab 65 at 1483 (amend 0004), 1486-1504 (specification), 1509 & 1517 (publication notice)) and on November 21, 2019. (AR Tab 65 at 1531 amend 0006), 1534-57 (specification), 1561-62 (publication notice); see also AR Tab 70 (updated specification)).

All offerors were well aware that the proposed contract was a build-to-print effort (see, e.g., AR Tab 65 at 1571-72 (questions 41, 44-46 emphasizing build-to-print effort)) and that it involved a narrow-width 6-panel design) (see, e.g., AR Tab 65 at 1559 (question 14 emphasizing 6-panel extrusions))

Neither UDRI nor Taber were involved the Air Force's internal redesign of the Next-Gen pallet. Indeed, in its December 23, 2019 Status Report to the Air Force under the LRIP contract, UDRI specifically noted: "the USAF has developed a new NGAA design with six panels instead of the four for manufacturing reasons . . .." (AR Tab 77 at 2466)

### 3. The Air Force Considered Potential OCI Issues Before AAR's Protest

The Air Force contracting officer responsible for developing the solicitation for this contract has been involved in the procurement since 2016. In addition, having discussed the prior development contract with his predecessor, he was familiar with the prior contract and the potential offerors, including Taber. In undertaking his initial analysis during the process of developing the solicitation, the contracting officer determined that there were no apparent potential OCIs. (AR 22-1 at 6; 22-75 at 2396)

During the March 27, 2019 presolicitation conference, the Air Force specifically addressed the conflicts issue when prospective offerors inquired if the development contractors would be excluded. The Air Force declined to do so because, "[t]he pallet that the Air Force is procuring is somewhat of a different design and is considered a full and open effort." (AR Tab 53 at 1000, 07)

In May 2019, in responding to yet more offeror questions, the Air Force explained why it had deviated from the original design: "A re-design was launched to provide a product with the performance attributes required (and an economically friendly design) while mitigating sourcing restrictions or limitations." (AR Tab 58 at 1024, questions 14, 16)

### G. The Air Force Thoroughly Investigated And Rejected AAR's OCI Concerns

On December 11, 2020, AAR protested the Air Force solicitation, averring that Taber should be barred from the procurement because it suffered from an OCI arising from biased grounds rules, unequal access to non-public information, and impaired objectivity. (AR Tab 72) The Air Force's contracting officer, having previously assessed there to be no OCI, undertook a month-long investigation of whether significant OCIs existed regarding Taber's involvement in the current Next–Gen pallet solicitation. His review resulted in an extensive determination documenting his analysis. (AR, Tab 75) As part of his review, the contracting officer considered:

(i) the scope of the Next–Gen development contract; (1) the role of Taber and other subcontractors, as well as UDRI, in the Next–Gen development contract; (2) the contract file for the Next–Gen pallet production contract; (3) declarations from Taber regarding interactions with Air Force personnel (id. at 2398-99, 2445-54); (4) the revisions (and source of the revisions) made to the production contract TDP as compared to the development contract TDP; (5) the contracting officer's own interactions with UDRI and Taber since his involvement with the Next–Gen pallet program began in 2016. (Id. at 2396-07). He also interviewed (and obtained a statement from) UDRI's project leader regarding the Next–Gen development contract. (Id. at 2398, 2408-11). He also obtained statements from 11 of the agency's technical, program, and contracting personnel involved in the Next–Gen pallet program regarding their interactions with Taber and Taber's alleged OCI. (Id. at 2411-43). After addressing in detail each of the three OCI grounds alleged by AAR, the contracting officer concluded that: "In accordance with the above findings and in accordance with the provisions of FAR Subpart 1.7, I hereby determine that ... there is no significant OCI affecting the [current RFP]." (Id. at 2406).

### H.     The GAO Sustained The Air Force's OCI Determination

The GAO denied AAR's protest. *AAR Manufacturing Inc. d.b.a. AAR Mobility Systems*, B-418339, 2020 WL 418339. In doing so, the GAO carefully reviewed the allegations and the extent of the contracting officer's investigation, the record, and the basis for his conclusions as to each of the three OCI issues, regarding ground rules, *id.,* *4-*6; unequal access, *id,* *6-*8, and impaired objectivity. *Id.,* *8-*10.   In determining that "the contracting officer reasonably investigated and considered each of the potential OCI issues raised", *id.,* 2020 WL 418339 *4, the GAO concluded:  "[T]he protester fails to show that the contacting officer was unaware of, or failed to consider, all relevant information when reviewing Taber's potential OCIs. The protester

essentially expresses disagreement with the contracting officer's judgments regarding the reasonableness of the OCI inquiry; such mere disagreement does not rise to the hard facts necessary to support a valid challenge. <u>Systems Made Simple, Inc.</u>, supra, at 13." *Id.,* *10.

## IV.  ARGUMENT

### A.  The Standard Of Review Is Deferential To The Air Force

The FAR defines an "Organizational conflict of interest" ("OCI") to mean "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." FAR 2.101.  The situations in which OCIs arise, as described in FAR subpart 9.5 can be broadly categorized into three groups: biased ground rules, unequal access to information, and impaired objectivity. FAR § 9.505-2, 9.505(a)-(b), 9.505(a)-(b).

The Court has recently articulated the deferential standard of review and heavy burden of proof on AAR to be applied in a protest based upon an OCI, such as this one:

> "Under FAR § 9.504(a), a CO [contracting officer] must '[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible' and '[a]void, neutralize, or mitigate *significant potential conflicts* before contract award." <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1386 (emphasis and alterations in original) (quoting FAR § 9.504(a) ); <u>see also</u> FAR § 9.504(a) (2018). " 'A significant potential conflict of interest is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.' " <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1386 (quoting <u>PAI Corp. v. United States</u>, 614 F.3d at 1352); <u>see also</u> <u>ViON Corp. v. United States</u>, 122 Fed.Cl. 559, 579 (2015) (quoting <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1386). "However, the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381-82 (citing FAR § 9.505); <u>see also</u> <u>Monterey Consultants, Inc. v. United States</u>, 120 Fed.Cl. 567, 572 (2015). Therefore, "[t]he CO has considerable discretion in determining whether a conflict is significant." <u>Turner Constr. Co. v.</u>

United States, 645 F.3d at 1386 (citing PAI Corp. v. United States, 614 F.3d at 1352); see also Parcel 49C Ltd. P'ship v. United States, 130 Fed.Cl. 109, 123 (2016) (citing PAI Corp. v. United States, 614 F.3d at 1352). Further, the identification of an OCI "must be based on 'hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough.' " Turner Constr. Co. v. United States, 645 F.3d at 1387 (quoting PAI Corp. v. United States, 614 F.3d at 1352); see also Loch Harbour Grp., Inc. v. United States, 128 Fed.Cl. 294, 302 (2016) ("But, to prove an OCI, LHG [protestor] must identify hard facts to support this claim. A mere inference or suspicion of an actual or apparent conflict is not enough." (citing PAI Corp. v. United States, 614 F.3d at 1352) ); Macaulay-Brown, Inc. v. United States, 125 Fed.Cl. 591, 602 (2016) (quoting Turner Constr. Co. v. United States, 645 F.3d at 1387).

*Sigmatech, Inc. v. United States*, 141 Fed.Cl. 284, 327 (2018).

In addition, although GAO decisions are not binding on the Court, the Court generally recognizes the GAO's expertise in such matters and should accord deference to the GAO's decisions. *North Carolina Division of Services for the Blind v. United States*, 53 Fed.Cl. 147, 165 n.13 (2002) ("While [GAO] decisions are not binding on [the COFC], [the COFC] accords deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions. [citations omitted]").

The administrative record establishes that the contracting officer thoroughly and thoughtfully considered all the pertinent facts under the development of the Next-Gen pallet and reasonably determined there to be no OCI. The GAO's' decision reflected a similarly comprehensive approach. AAR has failed to adduce the hard facts to establish that any OCI or that the decisions of the Air Force and GAO were not rational and supported by the record.

**B.    AAR Cannot Establish A Biased Ground Rules OCI**

The Court has articulated that:

"The biased ground rules category of OCIs focuses on the concerns that a company may, by participating in the process of setting procurement ground rules, have special knowledge of the agency's future requirements that may skew the competition in its favor." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1382

(Fed.Cir.2011). Under FAR § 9.505–1(a), "[a] contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production shall not ... be a subcontractor or consultant to a supplier of the system or any of its major components."15 FAR § 9.505–1(b) states that "[i]n performing these activities, a contractor occupies a highly influential and responsible position in determining a system's basic concepts and supervising their execution by other contractors." To show a violation under FAR § 9.505–1, the FAR requires that a bidder or subcontractor be "in a position to make decisions favoring its own products or capabilities" by providing "systems engineering" and "technical direction" for the relevant program. FAR § 9.505–1. FAR § 9.505–1(b) defines "systems engineering" as "a combination of substantially all of the following activities: determining specifications, identifying and resolving interface problems, developing test requirements, evaluating test data, and supervising design." FAR § 9.505–1(b) then defines "technical direction" as "a combination of substantially all of the following activities: developing work statements, determining parameters, directing other contractors' operations, and resolving technical controversies."

*Aegis Technologies Group, Inc. v. United States*, 128 Fed.Cl. 561, 571-72 (2016)

The essence of AAR's long-winded argument is that the Air Force and GAO erred in not treating the development contract as a systems and technical direction contract but instead determined it to be a development contract for which Taber fit within the two exceptions to the biased ground rules OCI rule. (Mot at 17-37) AAR's efforts to pigeonhole Taber and UDRI is misplaced and contradicted by the record.  First, the Air Force's own narrow-width design was carried out without Taber's or UDRI's participation and resulted in a new TDP and drawings which should eliminate the basis for AAR's biased ground rules protest. Second, AAR's argument misconstrues the significant development of the cutting edge Next-Gen pallet which UDRI designed, qualified, and delivered multiple prototypes during the development contract, with the assistance of Taber, ███████████, and others. This was the epitome of a development contract for which Taber is entitled to the benefit of the FAR OCI exception. The contracting officer's and GAO's determinations are rational, supported by the record, and should be sustained.

1. **The Air Force's Narrow-Width Redesign Was Carried Out Without UDRI's Or Taber's Participation, Eliminating The Basis For AAR's Ground Rules Protest**

It is undisputed that the Air Force redesigned the middle and edge extrusions from a wide-width to a narrow-width design, deciding internally that the loss of strength was worth the increase in the competition pool. (AR Tab 75 at 2399-2400) The Air Force accomplished the redesign without UDRI's or Taber's involvement, even as they were undertaking limited production for testing of the wide-width design pallets under the LRIP Task Order contract. Accordingly, Taber was not involved in developing the drawings, TDP, testing, evaluation or other aspects of the new pallet design which AAR contends is the basis by which Taber might have influenced the ground rules to favor itself. Accordingly, the redesign should eliminate AAR's basis for a ground rules OCI and its argument should be rejected.[9]

2. **Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Is Covered By The Development Contract Exception To the Biased Ground Rules OCI Prohibition**

AAR suggests that Taber just contributed to parts of the TDP and specifications in an effort to pigeonhole it into a systems engineering and technical advice (*i.e.*, a SETA) contract within the FAR 9.505-1 paradigm. Vacillating between arguments that the Next-Gen effort was merely a simple form, fit, and function effort of little consequence and that Taber was deeply involved in fundamental design changes, (Mot. 17-42) AAR misconstrues the significant effort undertaken to bring the new and cutting edge Next-Gen pallet to fruition. It ignores that the advanced product did not previously exist, even if it was to fit within the same geometry and serve the same purpose

---

[9] Taber may assert different grounds for judgment than those asserted by the United States and, similarly, the Court may decide a matter on alternate grounds. *See American Apparel, Inc. v. United States*, 108 Fed.Cl. 11 at 21-22, 30, 31 (2012). Although neither the contracting officer nor the GAO specifically addressed this issue, Taber's argument is harmonious with their views and ultimate conclusions. See AR Tab 75 at 2399-90; *AAR*, 2020 WL 1467331 at *9 (observing Air Force's modified version of the TDP rendered Taber's role in the design process even more attenuated).

as the balsawood Legacy pallet. Although AAR acknowledges that the 2014 contract was a "Design" contract, it ignores that it was financed with research and development funds. (See AR Tab 75 at 2401) And, although it cites to the broad contract provisions, it ignores what occurred under that contract, including: further design, qualification, and the actual manufacture of protypes for delivery to the Air Force. It further ignores the integrated efforts during 2014 to 2016 that were necessary between UDRI, Taber, ████████, among others, to bring the pallets to actual fruition rather than mere paper designs.

Contrary to AAR's assertion, Taber did not play the SETA effort role of an armchair systems engineer pushing paper for others to produce. It was engaged in the trenches, refining how to produce the extrusions successfully, commenting on UDRI's designs, engaging with the welding, machining and assembly subcontractors, and extruding the aluminum panels for the prototypes. UDRI's efforts involved the evolution of a ████████████████, which pushed Taber beyond its ████████. (AR Tab 75 Att. 14 at 2452 (Locher Decl. ¶ 9)). That contract fit well within the FAR definition of "Development", which means:

> the systematic use of scientific and technical knowledge in the design, development, testing, or evaluation of a potential new product or service (or of an improvement in an existing product or service) to meet specific performance requirements or objectives. It includes the functions of design engineering, prototyping, and engineering testing; it excludes subcontracted technical effort that is for the sole purpose of developing an additional source for an existing product.

FAR 35.001 (quoted in *AAR*, 2020 WL 1467331 *6). *See also* 31 CFR 35.201-18 (same definition). As the GAO observed, "'development and design work' [includes] … , as here, that which 'pushes the edges of technology in developing or designing new hardware or processes.'" *AAR*, 2020 WL *6, (*quoting GIC Agric. Grp.*, B–249065, Oct. 21, 1992, 92–2 CPD ¶263 at 10 n.6). As UDRI's technical lead observed: "the new specifications that UDRI drafted on the RIF contract and the

subsequent Air Force specifications for the Next Generation Cargo Pallets is expected to result in

███████████████████████████████████████████████████████████████████████

████████████████████████████████.″  (AR Tab 75 Att. 1 at 2408 ████████████

Decl. ¶ 4))

Because Taber was engaged in a development contract effort, as the contracting officer and

GAO correctly determined after a thorough analysis, it was entitled to the exception from an OCI

for such efforts even if that afforded it some advantage.  As the GAO observed:

> The FAR, however, also recognizes the unique role played by a development
> contractor in the procurement process: while a development contractor "has a
> competitive advantage, it is an unavoidable one that is not considered unfair; hence
> no prohibition should be imposed." FAR § 9.505–2(a)(3). Thus, regarding the
> development of a solicitation's work statement, the FAR states as follows:
>
>> If a contractor prepares, or assists in preparing, a work statement to be
>> used in competitively acquiring a system or services-or provides material
>> leading directly, predictably, and without delay to such a work statement-
>> that contractor may not supply the system major components of the
>> system, or the services <u>unless</u>-(i) It is the sole source; (ii) <u>It has
>> participated in the development and design work</u>; or (iii) <u>More than one
>> contractor has been involved in preparing the work statement</u>.
>
> FAR § 9.505–2(b)(1).

*AAR*, 2020 WL 1467331 *5 (emphasis added). Like the company which develops new electronic

equipment and, as a result of this development, prepares specifications, as to which the FAR allows

it to  supply the equipment, FAR 9.508(c), Taber developed, prototyped, and produced cutting

edge extrusions for this new product, was entitled to advise UDRI on its design from its

manufacturing perspective, and then compete for the production contract. The incumbency

experience Taber gained from the development contract (including its production of prototype

extrusions), and the follow-on LRIP contract to refine the overall manufacturing process and

deliver extrusions for 500 pallets cannot be used to bar it from the competition under these

████████████████████████████████████████████████████████████████

█████████████████████████████████████████

circumstances,[10] any more than its experience developed in extruding aluminum components for

a government ███████████████. (see AR Tab 109 at 2886 and p. 9 n.7, above)

The contracting officer and the GAO correctly applied the law to the facts and rationally

explained their decisions. None of the authorities cited by AAR establish otherwise under the facts

of this matter.[11]

3. **Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Is Covered By The Multiple Contractor Exception To the Biased Ground Rules OCI Prohibition**

As the contracting officer and the GAO noted, the FAR recognizes a multi-contractor

---

[10] As the GAO has determined:

> The mere existence of a prior or current contractual relationship between a contracting agency and a firm does not create an unfair competitive advantage, and an agency is not required to compensate for every competitive advantage gleaned by a potential offeror's prior performance of a particular requirement. For example, an incumbent contractor's acquired technical expertise and firsthand knowledge of the costs related to a requirement's complexity are not generally considered to constitute unfair advantages the procuring agency must eliminate. *Optimum Tech., Inc.*, B-266339.2, Apr. 16, 1996, 96-1 CPD ¶ 188 at 7; *Versar, Inc.*, B-254464.3, Feb. 16, 1994, 94-1 CPD ¶ 230 at 12.

*Snell Enter., Inc.*, 2002 WL 1492090 *7.

[11] AAR's reliance on *Filtration Development Co., LLC v. United States*, 60 Fed.Cl. 371 (2004) is inapposite (Mot. at 25), because it applies to a SETA contract situation where the contractor merely provides engineering support services. We have established that Taber was not a SETA contractor but was engaged in the panoply of activities of a development contractor. AAR also misapplied the quoted language from *Vantage*. (Mot at 26). The Court's primary citation FAR 9.505-1(a) established it was referring to Raytheon's role as the overall systems designed which it had previously discussed. *Vantage Associates, Inc. v. United States*, 59 Fed.Cl. 1, 11 (2003). Indeed, the Court subsequently approved application the development and design contractor exception based upon a separate determination that Raytheon was the development and design contractor and, as such, FAR 9.505-2(a)(3) permitted Raytheon's participation in the contract at issue. As a development and design contractor, Taber also is entitled to that exception. AAR's reliance upon *Ressler Associates, Inc.*, B- 244110, 1991 WL 182394, is misplaced. (Mot at 28) It involved a scheme where the protestor prepared documents that became the statement of work to perform the same work on a follow-on contract per request of government official without the contracting officer's knowledge. *Id.*, *2. The GAO rejected application of the development contract exception because the "the contract is for more of the same development and design services Ressler is currently performing, and the competitive advantage Ressler obtained was due to its participation in preparing the statement of work, not its performance of a prior contract." Id., *6. Here, Taber's work was development contract work to develop a new cutting-edge product for a different, production-type contract, not the same type of contract, so it is covered by the exception. It is not the *Ressler* situation scenario where it would be performing the same work on the solicited contract and does not involve the unsavory conduct in that case. AAR's passing references to *Ernst & Young, LLP v. United States*, 136 Fed.Cl. 475 (2018) and *Lucent Technologies World Services, Inc.*, B- 295462, 2005 WL 525448, are equally unavailing for the same reason that Taber's development role far exceeded those of the contractors in these cases.

exception to the ground rules OCI, where, "[m]ore than one contractor has been involved in preparing the work statement." FAR 9.505-2 (b)(1)(iii). The GAO has previously applied this exception in a general manner, without restriction, to an entire solicitation effort when it determined that "firms other than [the protested entity] HDM worked on the specifications as well." *American Artisan Productions, Inc.*, B- 292559, 2003 WL 22309118 *7 (bracketed material added). The GAO's decision here is consistent.

Without citation to any authority, AAR essentially asserts that the Next-Gen development contract ought to be deconstructed into individual elements in assessing application of the multi-contract exception, contending that would exclude Taber because it was the only extrusion contractor involved. (Mot. at 32-37) AAR's argument lacks merits because it would eviscerate the exception because only one entity is involved in a specific portion of a development effort.

The GAO's broader view is a logical and rational reading of the exception because that is how projects are developed and procured. They are not solicited in isolated silos but as an integrated effort reflecting the amalgamation of the various disciplines necessary to develop and manufacture a procured item. Thus, in this instance, the procurement will necessarily involve not just the pallet extrusions, but manufacture of the tie-down rings, the welding, machining, and fabricating of the overall pallet. Under AAR's theory, no one could ever qualify for the exception because one would have to ignore the collaboration that is a necessary part of the process.

AAR's reliance upon UDRI's statement that no one drove the design or specification decision, (Mot at 33-34) does not mean they did not contribute to the UDRI's development of work statement. UDRI was clear throughout that it developed the specifications and TDP with the benefit of input from Taber and many others. (See AR Tab 75 Att. 1 at 2409-2410) Clearly, UDRI

did not and could not have developed them without such collective input considering that all the elements would need to work together to result in the completion of a pallet.

Contrary to AAR's speculation about how the exception should be read, the GAO and contracting officer offered a rational and practical reading of the exception. Rather than being narrowly focused on excluding potential beneficiaries, the rule is appropriately general in recognition that a team effort is usually required – as it was here – to create a product and production contract work statement, because there has to be an interplay between all disciplines if the product is to be successfully made. Accordingly, the Court should reject AAR's speculative suggestion for how to read the multiple contractor exception and sustain that articulated by the contracting officer and the GAO.

### C. Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Cannot Succeed On Merits In Establishing Taber Had Access to Competitively Useful Nonpublic Information

An unequal access OCI arises in situations in which a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide the firm a competitive advantage in a later competition for a government contract. FAR 9.505-4; *Systems Plus, Inc. v. United States*, 69 Fed.Cl. 757, 770 (2006) The pertinent FAR provision focusses on (i) proprietary information of other companies and (ii) source selection information which may give an entity some advantage. FAR § 9.505–4. Thus, such conflicts are more likely to occur as the result of contracts involving management support services where contractors are embedded with the government. *See NetStar-1 Government Consulting, Inc. v. United States*, 101 Fed.Cl. 511, 520 (2011) (contractor gained unique information about competitor). As the contracting officer and the GAO correctly determined, no such OCI existed here.

As the GAO observed, *AAR*, 2020 WL 1467331 *4,*7, and as reflected in his extensive report, the contracting officer conducted a month-long investigation of the contracting process delving into his personal knowledge, multiple interviews, and review of numerous sworn affidavits from Taber, UDRI and the Air Force contracts, program, technical, and logistics teams who engaged with UDRI and Taber, (AR Tab 75 at 2396-5454) and concluded there was no OCI. (AR Tab 75 at 2403-05) To demonstrate that such a determination is arbitrary and capricious, AAR "must identify 'hard facts,' *see CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir, 1983); *Filtration Dev. Co., LLC v. United States*, 60 Fed.Cl. 371, 380 (2004); 'mere inference or suspicion of an actual or apparent conflict is not enough.'" *ARINC Engineering Services, LLC v. United States*, 77 Fed.Cl. 196, 202 (2007) (citation omitted). *See also Systems Plus, Inc.*, 69 Fed. Cl. at 772 (2006) (must have hard facts") But speculation and innuendo is really all that AAR offers.

AAR's argument, essentially, is that the contracting officer did not dig far enough to prove a negative, averring that he failed to sufficiently investigate every piece of paper which plaintiff speculates Taber might have received during the development and LRIP contracts. (Mot. 42-46) It further avers that he failed to address a laundry list of information to which Taber allegedly had access which the Air Force refused to give to offerors when requested. (Mot 46-48). These arguments fail for several reasons besides trying to establish a wholly unreasonable standard to confirm a negative.

First, the Air Force is now procuring a narrow-width pallet design in which Taber was uninvolved and therefore could not have had access to nonpublic competitively useful information. Contrary to AAR's speculation, (Mot at 45) the Air Force was designing the revised pallet and its new TDP and drawings while UDRI was completing work separately on the wide-width Task

Order. See 14-16, 17, 19-20, above (citing ████ Decl. and UDRI Final Report) Under the circumstances, there is simply no record evidence that Taber had any access to nonpublic information about the new design.

Second, assuming the wide-width design information is relevant, AAR misstates the scope of the contracting officer's investigation, his own knowledge, the interviews, and the 14 declarations. The contracting officer was involved in the project from 2016 and was aware of Taber's involvement. He had, in fact, previously determined that there was no apparent OCI. (AR 75 at 2396) Once AAR asserted an OCI, however, the contracting officer timely conducted his extensive investigation with input from contracts, technical, logistics, and other personnel from Taber, UDRI, and the Air Force, each of whom openly related their experiences and interactions with UDRI and Taber during the development and LRIP contracts. He was unaware of any transmission of nonpublic competitively useful information. (AR Tab 75 at 2404) UDRI's lead emphasized he sheltered Taber from the Air Force to ensure no private information passed to them. (See p. 12, above (████████)). The Air Force logistics lead emphasized that no information was to pass to Taber. (See p. 13, above (████)). The Air Force engineer of record and its narrow-width designer met often with UDRI and confirmed no information passed to Taber. (See pp 12-13, above (████████ and ████)) Taber recounted its engagement with UDRI and the Air Force in meetings and confirmed no private information was received.[12] Each and every person testified that no private information passed to Taber. (See AR Tab 75) AAR just disagrees with the contracting officer through speculation. That is insufficient to counter the uniform testimony and other evidence that supports the reasoned decision of the contracting officer and GAO.

---

[12] AAR's citation to a status report and one meeting with the Air Force establishes nothing. Indeed, the minutes of the meeting with the Air Force and others reflect that Taber was in a speaking mode. (Mot at 45)

AAR also asserts a laundry list of items it claims the Air Force declined to furnish to offerors of which it avers Taber was or may have been aware; indeed it contends Taber may have prepared some of it. (Mot 46-48) AAR overlooks that the current solicitation involves a build-to-print narrow-width design as to which all information necessary to manufacture a Next-Gen pallet is contained among the solicitation materials. Notably, AAR ignores that the Air Force declined to furnish some of the wide-width design information because it was concerned that it would be misleading to offers. (AR Tab 53 at 1005) (UDRI Final Report) In addition, AAR's concern during the solicitation was with Taber's supposed advantage regarding the wide-width design. (See p. 18, above) It offers nothing, much less hard facts, to show that Taber either was furnished the information asserted or that it gained any competitive advantage if it did.

As the GAO properly observed, and as reflected in the FAR, FAR 9.505-2 (a)(3), the mere fact an offeror has some advantage, unique information, or capability due to its prior experience, is not necessarily an improper OCI and the government is not required to equalize all competition. *AAR*, 2020 WL 146731 *8. To the extent that Taber gained some advantage from its development and LRIP subcontract work, or other contracts, that is not the basis for an OCI exclusion. "[W]hile the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair. . ." FAR 9.505-2(a)(3). As pertinent here, "[i]t is well settled, however, that while an offeror may possess unique information, advantages, and capabilities due to its prior experience under a government contract, including performance as the incumbent contractor, the government is not required to equalize competition to compensate for such an advantage, unless there is evidence of preferential treatment or other improper action. The existence of an advantage, in and of itself, does not constitute preferential treatment by the agency, nor is such a normally occurring advantage necessarily unfair. Indeed, the FAR specifically states that, while a

'development contractor,' . . . 'has a competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.'" *Alliant Techsystems, Inc.*, B-410036, 2014 WL 6065861*4 (quoting 48 C.F.R. § 9.505-2(a)(3)); *see also Lakota Tech. Sols, Inc.*, B-298297, 2006 WL 2254601 *3 (even if awardee had information on manufacture not available to others, no issue arises because technical package for build-to-print was sufficient for offerors to submit proposals).

The documents about which AAR complains were part of the development and LRIP contracts effort to develop and deliver pallets to the Air Force. To the extent Taber was privy to information that it prepared or flows from its legitimate role as a subcontractor that does not create an OCI as the contacting officer and GAO determined. Moreover, in revising the solicitation to include the new design TDP and drawings, the Air Force ensured that all offerors had correct, current information which was not misleading. The contracting officer carefully considered all of this and his decision, and that of the GAO affirming it, was considered and rational. It should be upheld in accordance with the discretion to be afforded to the agency in making such determinations. *See* 48 C.F.R. § 9.505 ("Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required …")

### D. Assuming Taber's Involvement Prior To The Air Force Redesign Remains Relevant, AAR Cannot Succeed In Proving Taber Would Be Impaired In Performing The Contract

The Court has recently articulated the impaired objectivity OCI standard and burden of proof as follows:

> An "impaired objectivity OCI" "occurs when a government contractor has conflicting obligations under different government contracts, that compromises the

contractor's ability to render impartial judgment." See <u>Axiom Res. Mgmt., Inc. v. United States</u>, 78 Fed.Cl. 576, 592 n.17 (2007) (citing FAR § 9.505-3; and <u>Aetna Gov't Health Plans, Inc.</u>, B-254397 et al., 1995 WL 449806, at *8-9 (Comp. Gen. July 27, 1995) ); <u>see also</u> <u>L-3 Commc'ns Corp. v. United States</u>, 99 Fed.Cl. 283, 297 (2011) ("The impaired objectivity OCI occurs 'where a firm's work under one contract might require it to evaluate itself under another contract.' " (quoting <u>Turner Constr. Co. v. United States</u>, 94 Fed.Cl. 561, 569 (2010), <u>aff'd</u>, 645 F.3d 1377 (Fed. Cir. 2011) ) ). A Judge of the United States Court of Federal Claims has stated that the "primary concern" of an impaired objectivity OCI is that "a firm might not be able to render 'impartial advice.' " <u>Turner Constr. Co. v. United States</u>, 94 Fed.Cl. at 569 (quoting <u>Aetna Gov't Health Plans, Inc.</u>, 1995 WL 449806, at *8); <u>see also</u> <u>A-P-T Research, Inc.</u>, B-413731.2, 2017 WL 1462127, at *9 (Comp. Gen. Apr. 3, 2017) (stating that an impaired objectivity OCI "principally concerns the contractor's ability to perform its contractual obligations free of improper bias"). "In order to show an 'impaired objectivity OCI', there must be hard facts showing that 'a government contractor's "work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals." ' " <u>Aegis Techs. Grp., Inc. v. United States</u>, 128 Fed.Cl. 561, 575 (2016) (quoting <u>Ala. Aircraft Indus., Inc.-Birmingham v. United States</u>, 83 Fed.Cl. 666, 687 (2008) (quoting <u>Aetna Gov't Health Plans, Inc.</u>, 1995 WL 449806, at *9), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 586 F.3d 1372 (Fed. Cir. 2009)).

*Sigmatech, Inc.*, 141 Fed.Cl. at 329; *see also* FAR 9.505-3.  Further, as with other types of OCIs, de minimis or insignificant OCIs do not warrant disqualification. In this vein, "[A]n agency may reasonably find that . . . the possibility of a conflict is too unlikely or speculative to conclude that there is a disqualifying OCI. . . ." *Deva & Assocs., PC*, B-415508.11, 2019 WL 2903379 *9 (*citing MAXIMUS Fed'l Servs.*, B-410359, 2014 WL 7649970 *8, and *Computers Universal, Inc.*, B-292794, 2003 WL 22717841 *2-*3).

AAR, as it did at the GAO, again overstates Taber's alleged involvement in the development contract to speculate that it <u>might</u> elect not to submit an optional Engineering Change Proposal ("ECP") or might breach its contract obligations by failing to submit accurate reports to the Air Force.  (Mot. at 38-40)  It adds to its argument at the GAO by now suggesting the contracting officer ignored that Taber might pull its punches on and ECP or "jeopardize the safety and quality control functions" by not reporting quality issues because it might embarrass itself or

be penalized. (*Id.*) Although AAR adds considerable hyperbole to its argument, it offers nothing substantive other than that it disagrees with the contracting officer's reasonable conclusion, (AR Tab 75 2402-03) which the GAO appropriately sustained, *AAR*, 2020 WL 146733 *8-*10, that no impermissible OCI exists under this procurement.   Several reasons support these decisions.

First, as the record establishes, neither Taber nor UDRI  were involved in the Air Force's new narrow-extrusion design. As such, Taber would have no reason to pull is punches regarding what it might question about the quality of or seek to improve on the Air Force's revised extrusion design.[13] It would be as impartial as any other contractor. Indeed, as a contractor on the government's extruded aluminum AM2 landing mats contract, Taber might well be incentivized to suggest improvements through cross fertilization on the two contract efforts.  (See p. 9 n.7, above; AR  Tab 109 at 2886)(noting Taber's work on AM2))

Second, as the contracting officer correctly observed, even if Taber contributed something to the design effort and TDP, it was "extremely limited" in terms of the overall development effort for which UDRI was the principal author. (AR Tab 70 at 2403 (citing to ▮▮▮▮▮ Decl.)) Indeed, neither Taber nor UDRI believe Taber contributed to the specifications or TDP. Considering Taber's views about its efforts on the contract, and its view that the design has changed, it is highly unlikely that Taber would feel constrained about raising quality issues regarding the Air Force's redesign of the extrusions. This was appropriately recognized by the GAO.

Third, as AAR acknowledges, this is not a design contract, but a build-to-print production contract (Mot. at 38) where the design has been proven out.  Under the circumstances AAR's concerns are illusory and a de minimis concern for this contract and therefore not a basis for an

---

[13] The GAO acknowledged as much in rejecting AAR's argument, observing: "as the current solicitation employs a modified version of the TDP prepared by UDRI, Taber's role in the design process and potential for an impaired objectivity OCI becomes even more attenuated." *AAR*, 2020 WL 1467331 *9.

OCI.  The contracting officer's reasonable consideration of and conclusions about the matter should be sustained as they were by the GAO in its reasoned decision.

### E.    AAR Cannot Establish Irreparable Harm / Prejudice

AAR recognizes that it must prove it was prejudiced and that it will suffer irreparable harm to succeed in its protest. (Mot at 48, 49)  AAR's contention that it is being denied a fair basis to compete because of the alleged flawed investigation is misplaced.  Equally unavailing is its assertion that allowing the Air Force to proceed with Taber in the mix would cause it irreparable harm.

During the solicitation process, AAR's singular articulated concern about Taber was its alleged unique capability to extrude wide-width designs. (See p. 18, above)  It, and others, requested the Air Force to redesign the extrusions to a narrow-width design, which it did. (see pp. 17-19, above)  AAR was afforded the very relief it sought and which it has specifically admitted creates a situation it where others can now extrude the relatively standard design.  (AR Tab 72 at 1672 (AAR stating: "The Air Force's amendment of the pallet drawings, splitting the pallet into six panels instead of three, however, eliminated any potential need for specific dimensional experience based on wide extrusions that were present in the original three-panel design.  The width, and other dimensions, of the profile sections are now relatively standard industry sizes that would not be unusual to extrude or weld, making any dimensional-based past performance restrictions unnecessary.  In short, width of the extrusion has no bearing mon a potential offeror's ability to successfully perform the instant requirement . . . .")  By its own admission, AAR cannot establish prejudice or irreparable harm.

The Air Force has carefully investigated and properly determined that there are no significant OCIs in this procurement. AAR is free to compete for the contract and therefore has suffered neither prejudice nor irreparable harm.

### F.     Balance of Hardships Favors The United States

The Air Force is entitled to substantial deference about what it procures and how it conducts its procurements. The Air Force has now ensured that AAR will have a fair opportunity under the FAR to compete if it so desires. Under the circumstances, the interests of the United States in moving forward with this procurement are equal to or surpass those of AAR.

### G.     Public Interest Favors The United States

Affording AAR a fair opportunity to compete is certainly in the public interest. By its own statements seeking a narrow design to neutralize Taber's supposed advantage, which the Air Force agreed to, AAR has now received what it sought for a fair competition. The  public interest also is served by having the Air Force proceed with the procurement for the redesigned Next-Gen pallets. Accordingly, the public interest favors the United States.

## V.     CONCLUSION

The singular concern AAR articulated about Taber's involvement during the development contract was that it possessed unique skills in fabricating wide-design extrusions.  The Air Force, responding to AAR's and others' concerns, designed a narrow-width extrusion pallet component which resolved that issue. AAR admitted such.  Moreover, assuming Taber's involvement in the development contract prior to the redesign remains relevant, the Air Force and the GAO correctly determined that there exists no impermissible OCI under any theory which requires Taber to be excluded from this procurement.  Accordingly, and for the reasons stated above, the Court should

deny AAR's motion for judgment on the administrative record, grant Taber's motion, and the motion of the United States, and dismiss AAR's protest.

<div style="text-align: right">

Respectfully submitted,

/s/ *Anthony H. Anikeeff*

</div>

Date: June 15, 2020

<div style="margin-left: 50%">

Anthony H. Anikeeff
Williams Mullen, PC
8300 Greensboro Drive
Suite 1100
Tysons, VA 22102
Tel: 703-760-5206
Fax: 703-748-0244
Email: aanikeeff@williamsmullen.com

OF COUNSEL

Shayn Allen Fernandez, Esq.
Williams Mullen, PC
222 Central Park Avenue, Suite 1700
Virginia Beach, VA 23462-3035
(757) 629-0713 (phone)
(757) 473-0395 (facsimile)
Email: sfernandez@williamsmullen.com

</div>

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 15, 2020, a copy of the foregoing document was filed electronically with Court's electronic filing system. I understand that notice of the filing will be sent to all parties by operation of the Court's electronic filing system and that the following parties may access this filing through the Court's system.

Paul Robert Hurst, Esq.
Steptoe & Johnson, LLP (DC)
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-8089
Fax: (202) 429-3902
Email: phurst@steptoe.com

Counsel for AAR Manufacturing, Inc. d/b/a  AAR Mobility Systems

Stephen C. Tosini, Esq.
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-5196
Stephen.Tosini@usdoj.gov

Counsel for the United States

/s/   *Anthony H. Anikeeff*
Anthony H. Anikeeff
Williams Mullen, PC
8300 Greensboro Drive
Suite 1100
Tysons, VA 22102
Tel: 703-760-5206
Fax: 703-748-0244
Email: aanikeeff@williamsmullen.com

Counsel for Taber Extrusions, LLC